# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 5, 2013          Decided July 9, 2013

No. 11-7086

LINDSAY HUTHNANCE,
APPELLEE

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-01871)

*Mary L. Wilson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellants. With her on the briefs were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

*John Moustakas* argued the cause for appellee. With him on the brief were *Jeffrey D. Skinner*, *Andrew S. Hudson*, *Arthur B. Spitzer*, and *Frederick V. Mulhauser*.

Before: BROWN and KAVANAUGH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

BROWN, *Circuit Judge*: The District of Columbia and two of its police officers appeal a jury verdict in favor of Lindsay Huthnance, an alleged victim of overzealous law enforcement. Huthnance claimed District police violated her common-law, statutory, and constitutional rights when they arrested her for disorderly conduct. A jury agreed, awarding her $90,000 in compensatory damages against the District and two of its officers, as well as $7,500 in punitive damages against the individual officers. The District and the officers now challenge the district court's decision to exclude certain evidence, and argue that two jury instructions were improper. We agree the court erred by issuing a missing evidence instruction, but conclude the error was not prejudicial and affirm the district court.

I

On November 15, 2005, Huthnance and her boyfriend, Adrien Marsoni, joined two friends at the Raven Bar and Grill in the District's Mt. Pleasant neighborhood for a few drinks. On their walk home afterwards, Huthnance and Marsoni stopped at a 7-Eleven to buy cigarettes, a decision that ultimately spoiled what may otherwise have been a lovely evening. The parties dispute what happened, but in broad strokes, Huthnance got into a verbal tussle with some police officers and was arrested for disorderly conduct.

This is Huthnance's story. She "saw a number of police officers inside" the 7-Eleven and asked "what was going on." Trial Tr. 52 (Mar. 7, 2011). Apparently uninterested in friendly banter, the officers told her to mind her own business and move along, so she turned to Marsoni and said, "Wow,

nice use of my tax dollars." *Id.* One of the officers, "in sort of a confrontational way," challenged Huthnance to repeat herself, but she declined and walked out of the store, intending to go home. *Id.* at 52, 55. On their way out, Marsoni told someone outside the 7-Eleven to "fuck off," but they continued "up the street" unmolested. *Id.* at 55, 112. This did not last. Two officers—James Antonio, the person Marsoni told to "fuck off," and Liliana Acebal—followed Huthnance and Marsoni, stopped them, and demanded to see identification. Marsoni complied; Huthnance did not. Instead, she "asked continuously" why she was being stopped, whether the officers had probable cause, and whether she was under arrest. *Id.* at 55. The officers did not respond. Huthnance then "raise[d her] voice" and said "I want your badge number." *Id.* at 55, 61. She was instead told to put her hands against the wall. She complied, at which point Officer Acebal searched and handcuffed her. A third officer drove Huthnance to the police station, where she remained until morning. Huthnance claims this encounter began around 11:45 p.m. and that she was arrested ten minutes later and was taken to the police station soon after midnight.

The appellants paint a very different picture. Relying on Officer Antonio's and Officer Acebal's trial testimony, they claim Officers Antonio and Acebal, along with Officer Jose Morales, stopped to use the 7-Eleven's bathroom during a plainclothes robbery detail. Officers Antonio and Acebal waited outside while Officer Morales went inside, and while sitting in their car, they saw Huthnance inside the 7-Eleven, "backing up towards the door. . . . waving her arms around" with "her middle finger ex[t]ended towards the officers that were inside the 7-Eleven." Trial Tr. 43 (Mar. 11, 2011). They also heard her "scream out: You donut eating mother fuckers, this is where my tax dollars are going." *Id.* at 44. Seeing that his colleagues inside 7-Eleven had not asked Huthnance to

stop "standing in the doorway" and that two people "had walked up and tried to get into the 7-Eleven," Officer Antonio approached Huthnance and asked her to "keep it down and just keep moving." *Id.* at 44–45. Officer Acebal also asked Huthnance to calm down. Apparently unappreciative of the officers' solicitude for potential 7-Eleven patrons, Huthnance screamed, "Fuck you. Mind your own fucking business, go fuck yourself." *Id.* at 45. Huthnance and Marsoni then began walking away, but Huthnance turned around, pulling back from Marsoni, and in a "[v]ery loud" voice said, "Fuck that. I ain't fucking going nowhere. I'm a fucking citizen, I know my fucking rights." *Id.* at 48. Marsoni repeatedly tried to calm her down and go home, but despite his best efforts, she began walking back toward the officers, yelling further affirmations of her citizenship and rights.

By now, the officers had asked her a number of times to calm down and go home and warned her that if she did not, they would issue her a citation for being "loud and boisterous." *Id.* at 55. People were also beginning to "gather around" to see what was happening, residents of the apartments across the street were turning on their lights, and vehicles were slowing and stopping. Officer Antonio therefore walked back to the car to get the citation booklet, and Officer Acebal asked Huthnance for identification. Huthnance, who is about a foot taller than Officer Acebal, stood "basically on top of" the officer and replied, "Fuck you little bitch, I ain't giving you shit." *Id.* at 60. The officers had noticed "a hint of alcohol on her breath" and that her hair was "a little messy" and her eyes "a little red," *id.* at 46, so when bystanders started moving closer, the officers decided to arrest her. Huthnance then asked, "What are you arresting me for, being drunk and eating a burrito?" Trial Tr. 29 (Mar. 14, 2011). According to the officers' testimony at trial, they first

arrived at the 7-Eleven around 1:40 a.m. on November 16 and arrested Huthnance somewhere between 1:45 and 1:55 a.m.

Huthnance eventually sued the District of Columbia and Officers Antonio, Acebal, and Morales claiming the police essentially arrested her for "contempt of cop," Appellee's Br. at 1, and that the government knew or should have known about its officers' habits of doing so and failed to train them properly. After a few weeks of trial, the jury found that Officer Antonio and Officer Acebal committed the tort of false arrest and violated Huthnance's First and Fourth Amendment rights, that Officer Acebal committed the tort of assault and battery, and that the District was deliberately indifferent to citizens' First and Fourth Amendment rights.[1] The jury found Morales was not liable on any of the counts. The District and Officers Antonio and Acebal now appeal.

II

During discovery, Huthnance asked the District to produce "[a]ll Documents referring or relating to the arrest and detention of Plaintiff (and any encounter that preceded it) . . . including, without limitation, any police reports, witness statements, log entries, video recordings, post and forfeit paperwork, and all radio communications/transmissions relating to Plaintiffs [*sic*] arrest, detention and transportation." The District produced the arrest report the officers prepared at the police station after arresting Huthnance, the form Huthnance signed in jail that entitled her to release, and a "Court Case Review Form." The

---

[1] Huthnance also claimed the officers misused the procedure through which she was released from arrest, thereby violating her Fifth Amendment rights. The jury found in her favor, but the district court later vacated the verdict.

District later supplemented its response, stating, "As a result of its search, the District has concluded that there are no radio communications related to plaintiff's arrest, however see Attachment 21, radio log related to plaintiff's arrest." The radio log in question listed the following information:

AGENCY:                          MPD
DATE/TIME:                       20051116020505ES
DISPATCH DATE/TIME:              20051116020506ES
UNIQUE ID:                       5118642
CASE NUMBER:                     R2005155750
ADDRESS:       3100 MOUNT PLEASANT ST NW

Huthnance subsequently told the District she wanted to depose someone about radio transmissions, so the District produced a supervisor at its Office of Unified Communications. *See* FED. R. CIV. P. 30(b)(6). The following exchange occurred at the deposition:

Q: [W]hen a requester wants to pull information about a call, how does your office—what information does your office use as the identifier to match up the request with the call?
A: Usually the location, time and date.
Q: You say "usually." There's times when you use other identifiers?
A: Maybe the central complaint number, . . . the CCN number.
Q: And the CCN number is the category on [the radio log] marked complaint number, I believe.
A: No. They are two separate things.
Q: So the CCN number, is that the case number on this [radio log]?
A: No. It's different.

> Q: Okay. So I don't see CCN number on this radio [log], correct?
> A: Right.

Huthnance asked no follow-up questions, a decision she later explained was the result of her conclusion that the radio log, unconnected to her arrest, had been produced only because of its relationship to the date, time, and location of her arrest. As Huthnance pointed out, the address 3100 Mount Pleasant Street corresponds to a liquor store down the street from where she was arrested.

This was the end of the matter until Officer Antonio testified at trial that Huthnance's arrest "was called into dispatch" at 2:05 a.m. and that he knew the time because "[i]n preparing for the trial, I observed a dispatcher's report." Trial Tr. 64 (Mar. 11, 2011). Huthnance filed, and the district court granted, a motion in limine to block any further testimony and evidence about the radio log. Later that day, however, the appellants' expert witness referenced the radio log twice. First, explaining why the arrest report was not a "perfect narrative," he stated:

> [T]here have been certain inaccuracies, but minor, pointed out already in it. Dates—and I don't say that the times—the times from the evidence that I've seen about the dispatch runs, they certainly corroborate the time on this particular document. So I don't consider that a mistake or an inaccuracy.

Trial Tr. 116 (Mar. 14, 2011). Second, he testified the typographical errors on the arrest report did not "negate the lawfulness of the arrest" because "we know that from other records that the event took place in the morning of the 16th of

October." *Id.* at 121.[2] Huthnance's counsel approached the bench to complain about the witness's disregard of the court's order, and the appellants' counsel apologized, noting that the witness had in fact been instructed not to refer to the radio log.

The district court's order granting Huthnance's motion in limine had also provided that Huthnance "is entitled to a missing evidence instruction or, at her election at or before the end of the trial, an instruction that Officer Antonio's testimony about the dispatch report be disregarded," and Huthnance ultimately invoked that provision, asking the court to issue the missing evidence instruction. Over the District's objections, the court granted Huthnance's wish and instructed the jury it could infer the radio log was not introduced into evidence either because it does not exist or because it would have been unfavorable to the District and the officers' case.

The appellants challenge both the court's decision to exclude evidence relating to the radio log and its missing evidence jury instruction. We review the district court's evidentiary rulings for abuse of discretion, *see, e.g.*, *Chedick v. Nash*, 151 F.3d 1077, 1084 (D.C. Cir. 1998), and we apply the same standard to its articulation of jury instructions, *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993), and its threshold decision to issue a missing evidence instruction, *see Czekalski v. LaHood*, 589 F.3d 449, 455 (D.C. Cir. 2009). That said, we will reverse an erroneous evidentiary ruling or jury instruction only if the error affects a party's substantial rights. *See* FED. R. CIV. P. 61.

---

[2] The witness apparently misspoke since the log shows the dispatch was recorded in 2005 on November 16 at 2:05:05 Eastern Standard time.

9

A

The district court did not abuse its discretion by excluding evidence of the radio log.[3] Before trial, the court ordered the parties to file a joint statement describing, among other things, "each exhibit to be offered in evidence." Order App'x A, No. 1:06-cv-01871 (D.D.C. Jan. 21, 2010). The order stated that "[t]here is a strong presumption that any exhibit not listed in accordance with this court's order will not be admitted at trial." *Id.* The appellants admit they never listed the radio log on their pretrial exhibit list. Nor do they point to any place in the record suggesting they tried to amend the exhibit list. True, the district court's presumption was ostensibly rebuttable, but the appellants also point to nothing in the record suggesting they tried to rebut the presumption and introduce the radio log.

Instead, they tell us that "[a]ny prejudice to Huthnance . . . was outweighed by the document's importance to the defense, especially the individual officers, and the truth-seeking function of the jury," particularly given that Huthnance had possessed a copy of the radio log for over a year before trial and the Rule 30(b)(6) deponent did not represent the individual officers. Appellants' Br. at 35. Given the appellants' apparent lack of interest in introducing evidence "importan[t]" to their case, we find it hard to say the district court abused its discretion by relying on the parties' implicit representations about the utility of the available

---

[3] The appellants allot only one paragraph to this argument and barely mention the standard for reviewing district court evidentiary decisions. *See* FED. R. APP. P. 28 (requiring appellant's brief to contain "for each issue, a concise statement of the applicable standard of review"). Not a strong start.

evidence[4] or by enforcing a pretrial order the appellants concede was proper. Nor do we think the district court abused its discretion by consigning the consequences of exclusion to the party that could have most easily prevented it. *See* Mem. Op., No. 1:06-cv-01871, at 35 (D.D.C. July 19, 2011) (suggesting the appellants could have avoided any problems caused by the exclusion of the radio log simply by "follow[ing] the rules").

That Huthnance possessed the radio log before trial is a clever non sequitur: possession does not entail knowledge. True, the context was such that Huthnance was on notice she might need to investigate further, if only to shore up her stock of impeachment evidence—for instance, by asking the deponent or individual officers to compare the documents directly. *See* 2 MCCORMICK ON EVIDENCE § 264 (7th ed. 2013) ("It is wiser to hold that if an argument on failure to produce proof is fallacious, the remedy is the answering argument and the jury's good sense."). But there is also no evidence Huthnance acted in bad faith when, as the appellants decry, she failed to notice independently that the eleven-digit "case number" listed on the radio log (R2005155750) comprised the central complaint number listed on the arrest report (155750) preceded by the letter "R" and the four digit year (2005). Since 2005 was obviously the year, the District's system was not particularly difficult to decipher. However, not only did the District's Rule 30(b)(6) deponent not link the

---

[4] There is no reason to think the radio log was more than minimally probative because, as the district court explained, "[t]here was no evidence that the call to the dispatch happened contemporaneously with the arrest." Mem. Op., No. 1:06-cv-01871, at 33 (D.D.C. July 19, 2011). Officer Antonio testified that officers are required to call arrests into dispatch "upon making the arrest" and that Huthnance's arrest was called into dispatch at 2:05 a.m., Trial Tr. 63–64 (Mar. 11, 2011), and the appellants point to no other evidence in the record that would bear on the matter.

radio log to Huthnance's arrest, a fact the appellants acknowledge, but he effectively denied the numeric overlap.

B

Once it excluded the radio log and related evidence, however, the district court erred by issuing the missing evidence instruction.

1

The missing evidence rule provides that "when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Int'l Union, United Auto., Aerospace & Agricultural Implement Workers of America (UAW) v. NLRB* ("*Int'l Union*"), 459 F.2d 1329, 1336 (D.C. Cir. 1972). The idea is that "all other things being equal, a party will of his own volition introduce the strongest evidence available to prove his case." *Id.* at 1338. Thus, "[t]he production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. Silence then becomes evidence of the most convincing character." *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939) (internal citations omitted).

Pushed to its outer limits, this logic suggests *any* failure to introduce ostensibly relevant evidence warrants an adverse inference. The missing evidence rule does not go so far. We have, for instance, denied the inference where the evidence was not "peculiarly within the power of one party." *Czekalski*, 589 F.3d at 455 (internal quotation marks omitted). Thus circumscribed, the rule serves a practical function—whether efficiency, deterrence, cost allocation, or otherwise. *See, e.g.*, *Int'l Union*, 459 F.2d at 1338–39.

We have likewise proscribed the inference when its premises do not obtain, such as when there are innocuous explanations for the party's failure to introduce the evidence. Explanations might range from "[c]onsiderations of strategy, economy and logistics, reinforced by the rule against cumulative evidence," *United States v. Pitts*, 918 F.2d 197, 199 (D.C. Cir. 1990), to the judge's or other party's role in suppressing the evidence or the party's belief "his opponent has failed to meet his burden of proof," *Int'l Union*, 459 F.2d at 1338. The missing evidence rule is unavailable, for example, where the evidence in question is constitutionally protected. *See, e.g.*, *id.* at 1339 n.45.

The rule is thus "disappointingly free of mystery and mumbo-jumbo." *Id.* at 1335. Though its roots dig deeper than Blackstone, *see, e.g.*, 2 WILLIAM BLACKSTONE, COMMENTARIES *368, the rule is "more a product of common sense than of the common law." *Int'l Union*, 459 F.2d at 1335. At bottom, the question is whether an adverse inference is "natural and reasonable." *United States v. Craven*, 458 F.2d 802, 805 (D.C. Cir. 1972); *see* 2 WIGMORE, EVIDENCE §§ 285–90 (James H. Chadbourn rev., 1979). If not, then it does not matter that the doctrine's prerequisites are otherwise satisfied. *See United States v. Norris*, 873 F.2d 1519, 1522 (D.C. Cir. 1989).

The district court plays an important role in this regard. It must "determine whether a jury could appropriately deduce from the underlying circumstances the adverse fact sought to be inferred." *Burgess v. United States*, 440 F.2d 226, 237 (D.C. Cir. 1970) (Robinson, J., concurring); *see id.* at 234 (opinion of Fahy, J.); *Brown v. United States*, 414 F.2d 1165, 1167 (D.C. Cir. 1969). As our standard of review makes manifest, this gatekeeping function entails a fair amount of

discretion. But in exercising that discretion, a district court may not abandon its post at the bulwarks of our justice system. Because the missing evidence instruction deals not with evidence but with its absence, "there is the danger that the instruction permitting an adverse inference may add a fictitious weight to one side or another of the case." *Burgess*, 440 F.2d at 234 (opinion of Fahy, J.). Court instructions have the weight of law, whether they require or merely permit the inference, *id.* at 235, so the court should not thumb the scales unnecessarily. Sometimes, to be sure, evidence is so strong a party would be crazy not to introduce it. But when it would be inappropriate to draw an adverse inference, the district court should not instruct the jury it may do so.

Such was the case here. The District gave Huthnance a copy of the radio log during discovery and affirmatively (if somewhat ambiguously) stated that the log "related to plaintiff's arrest"; and though its Rule 30(b)(6) deponent erroneously failed to link the log to the arrest report,[5] the deponent's statements did not necessarily mean the log was irrelevant or, if it was, that the District did not believe otherwise. The district court knew all this.[6] By listing the

---

[5] Whether in fact the radio log sheds light on Huthnance's arrest would not ordinarily be for us to decide, but Huthnance effectively conceded the log's relationship to the arrest report at oral argument. *See* Oral Arg. 12:24–12:51.

[6] We make no claim about whether the radio log was "peculiarly" within the appellants' control. At oral argument, Huthnance suggested for the first time that the log was "constructively missing evidence" insofar as Huthnance's ignorance about the log's relevance means it was effectively within the appellants' peculiar control. Oral Arg. 26:49–29:37. This has some force. We, along with other circuits, have interpreted the "peculiar availability" requirement of the analogous missing witness instruction in a practical, not just physical, sense. *See, e.g.*,

dispatch time as 2:05 a.m., November 16, the log tended to support the appellants' claims about what time everything happened. The district court knew this, as well. And once the court excluded the log, the appellants could not (try to) introduce it even if they wanted to. We cannot squeeze an adverse inference from these facts; there is simply no evidence the District—the only appellant subject to any charges of fault—sought to hide the ball. Nor, on the facts of this case, would a missing evidence instruction serve any useful function. Quite the opposite. Condoning the missing evidence instruction here would incentivize gamesmanship. *See Burgess*, 440 F.2d at 239 (Robb, J., concurring); *United States v. Comulada*, 340 F.2d 449, 453 (2d Cir. 1965). As we noted above, Huthnance's ignorance about the log's relevance appears to have been a misunderstanding she could have avoided simply by looking more closely at it or by asking a few more questions.

Pointing to the district court's statement that "the District is having sanctions imposed against it for their conduct in the case," Trial Tr. 13 (Mar. 23, 2011), Huthnance maintains the missing evidence instruction was nevertheless an appropriate trial-management device. Yet even assuming the court's reference to sanctions in fact referred to the missing evidence

---

*United States v. Young*, 463 F.2d 934, 942 (D.C. Cir. 1972); *Sagendorf-Teal v. County of Rensselaer*, 100 F.3d 270, 275 (2d Cir. 1996); *Oxman v. WLS-TV*, 12 F.3d 652, 661 (7th Cir. 1993); *United States v. Spinosa*, 982 F.2d 620, 632 (1st Cir. 1992); *United States v. Blakemore*, 489 F.2d 193, 195 (6th Cir. 1973). But in light of Huthnance's failure to make this argument earlier, *see, e.g.*, *United States v. Southerland*, 486 F.3d 1355, 1360 (D.C. Cir. 2007), her emphasis that her "principal argument" is that the instruction was a sanction, Oral Argument 29:52–30:37, and our conclusion that an adverse inference was nevertheless inappropriate here, we can leave that question unresolved.

instruction—which is not at all clear[7]—the record offers no indication why any additional sanction was needed once the radio log had been excluded. Officer Antonio's testimony did not violate the district court's pretrial order, which prohibited the parties only from introducing certain "exhibits," or the exclusion order, which had not yet been entered; nor is there evidence suggesting the appellants knew their expert would reference the log. To the contrary, the only record evidence on the matter is appellants' counsel's statements to the court that he had in fact instructed the witness about the exclusion order.

Huthnance advances an alternative reason why the testimony was improper and therefore necessitated the missing evidence instruction: it violated the federal rules of evidence—in particular, the rule against hearsay and the best

---

[7] The court's reference was vague, and the only other time it invoked the concept of evidentiary sanctions was in a post-trial discussion about excluding evidence in which it also declined to describe its exclusion order as a sanction. As may be evident from our discussion, the district court did not clearly explain why it issued the missing evidence instruction. The instruction made its first appearance in the case when Huthnance filed the motion in limine to exclude the radio log and requested one of two possible curative instructions. After oral argument at which neither party discussed the instructions, the court adopted Huthnance's proposed order—which empowered her to decide which instruction would be given—basically unchanged. Later, Huthnance included a missing evidence instruction in her proposed jury instructions, and after oral argument, the court again decided to issue the instruction. The court did so, however, at the same time it ruled on a different proposed instruction, so the only clues it provided about its thought process were its comment about sanctions and its recognition that the instruction would be "very damaging" to the individual defendants who had nothing to do with the Rule 30(b)(6) deposition mix-up, Trial Tr. 10 (Mar. 23, 2011), which of course is a reason *not* to issue the instruction.

evidence rule. We remain unpersuaded. The missing evidence instruction is not a panacea for evidentiary errors. If Officer Antonio's or the expert witness's testimony violated the rules of evidence, Huthnance should have objected, and if sustained, that would have presumably afforded a sufficient remedy—particularly if accompanied by a simple instruction to disregard the testimony.[8] Though she now insists otherwise, Huthnance implicitly acknowledged the sufficiency of that approach when, in her motion to exclude the radio log, she asked the court either to issue a missing evidence instruction *or* to instruct the jury to disregard Officer Antonio's testimony about the log; she then doubled down on that position after trial when she suggested to the district court that the jury "carefully adhered to its instructions," Plaintiff's Opp. to Defendants' Post-Trial Mot., No. 1:06-cv-01871, at 18 (D.D.C. May 26, 2011). Huthnance made the strategic decision to seek exclusion of the evidence without the jury's knowledge, *see* Oral Arg. 15:04–15:25, and to complain in a sidebar discussion about the expert witness's violation of the exclusion order, *see, e.g.*, Trial Tr. 121 (Mar. 14, 2011). That was her choice.

2

A court confronting a trial error must ask whether the error substantially affected the outcome of the case. If the court cannot say with fair assurance the error was harmless, it must conclude the error was not. *See Williams v. U.S. Elevator Corp.*, 920 F.2d 1019, 1022–23 & n.5 (D.C. Cir.

---

[8] Though we have acknowledged that "objection cannot always procure realistic cure for damage," *United States v. Young*, 463 F.2d 934, 940 (D.C. Cir. 1972), an objection—particularly one accompanied by judicial instruction—may sometimes suffice. *See United States v. Foster*, 557 F.3d 650, 656 (D.C. Cir. 2009); *Gaither v. United States*, 413 F.2d 1061, 1080 (D.C. Cir. 1969).

1990). This analysis depends on a number of factors, including the closeness of the case, the centrality of the issue in question, and the effectiveness of any steps taken to mitigate the effects of the error. *See Carter v. District of Columbia*, 795 F.2d 116, 132 (D.C. Cir. 1986).

The parties' accounts of what happened differ materially, and the evidence at trial was equivocal, tending to corroborate both parties' positions. Yet the radio log was not central to this credibility dispute because only the jury's findings about *what* happened were outcome determinative, and the log was relevant only because it tended to corroborate the appellants' claims about *when* everything happened. The jury could have determined that everything happened at 2 a.m. but still found for Huthnance, or it could have determined that everything happened at midnight but still found for the appellants. *See* Appellants' Br. at 50 (arguing Huthnance breached the peace by disturbing people who were likely asleep in their apartments, "*whether it was midnight or 2:00 a.m.*" (emphasis added)). It likewise could have determined the radio log had little bearing on which party's story was correct because, as we noted above, the log did not necessarily make a claim about when the arrest happened. *See supra* note 4. The missing evidence instruction called the jury's attention to all of these distinctions by framing the log's relevance in terms of its alleged ability to "show[] the time that the arresting officers reported Ms. Huthnance's arrest," Jury Instructions, No. 1:06-cv-01871, at 3 (D.D.C. March 24, 2011) ("Jury Instructions").

In a slightly different case, we might have concluded the instruction was nevertheless prejudicial: notwithstanding the log's relevance to the case *before* trial, the instruction might have mattered in light of what happened *at* trial. In this case,

however, it did not.[9] First, District police sergeant Michael Smith—who, Officer Antonio testified, was generally present at the time of the incident—testified in a deposition Huthnance introduced at trial that he saw Officers Antonio and Acebal at the 7-Eleven "maybe around 12:00 o'clock at night" and that he saw them talking to "some lady" and "a guy" a few businesses away from the 7-Eleven. Trial Tr. 128 (Mar. 9, 2011). Sergeant Smith did not recall the woman "yelling and screaming in the 7-Eleven" or otherwise doing anything that would "get [his] attention at all," and he testified he could not hear their voices from about fifty feet away. *Id.* at 129–30. Yet the appellants have not pointed to any place in the record where they refuted his apparently neutral testimony or explained it away.

Second, the district court also issued a missing witness instruction—an instruction of the same doctrinal vintage as the missing evidence instruction—about two eyewitnesses the appellants identified but who never testified at trial,[10] and the appellants have offered no reason to think the jury would have drawn an adverse inference about the radio log but not the missing witnesses. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he party that seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted." (internal quotation marks omitted)).

---

[9] It is suggestive that Huthnance's counsel all but ignored the timing dispute during closing argument, expressly telling the jury that timing was irrelevant. He apparently did not think the jury's decision would be swayed by the appellants' failure to introduce the log. The appellants' counsel implicitly agreed when he only briefly mentioned the issue and only as an avenue to insight about Huthnance's general credibility and the likelihood that she was drunker than she thought.

[10] The appellants do not challenge this instruction.

19

Needless to say, those witnesses would have testified about more than just the time the officers phoned in Huthnance's arrest. So not only did the missing witness instruction—unlike the missing evidence instruction—go to the heart of the factual dispute, but even without the missing evidence instruction, the jury would still have been instructed it could draw an inference adverse to the appellants about the very same issue implicated by the missing evidence instruction.

III

At the time of Huthnance's arrest, the District's disorderly conduct statute prohibited "shout[ing] or mak[ing] a noise either outside or inside a building during the nighttime to the annoyance or disturbance of any considerable number of persons," but only if someone did so "with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby." D.C. CODE § 22-1321 (1981); *see In re T.L.*, 996 A.2d 805, 809–10 (D.C. 2010).[11] The district court paraphrased this statute to the jury and explained that it could find Huthnance intended, or was likely, to breach the peace only if she (i) "[w]as so

[11] In relevant part, the statute provided:

Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby: . . . (3) shouts or makes a noise either outside or inside a building during the nighttime to the annoyance or disturbance of any considerable number of persons . . . shall be fined not more than $250 or imprisoned not more than 90 days, or both.

The District later revamped the statute. The law now prohibits, among other things, "unreasonably loud noise between 10:00 p.m. and 7:00 a.m. that is likely to annoy or disturb one or more other persons in their residences." D.C. CODE § 22-1321(d).

unreasonably loud as to unreasonably intrude on the privacy of a captive audience, or so loud and continued as to offend a reasonable person of common sensibilities and disrupt the reasonable conduct of basic nighttime activities such as sleep," and (ii) "[d]id wake, or was likely to wake a considerable number of people from sleep, or did intrude, or was likely to intrude on the reasonable expectation of tranquility in the home of a considerable number of people." The appellants believe this explanation of the breach-of-peace element misstated the law "because it focused on a captive audience and the disruption of sleep or the tranquility of the home." Appellants' Br. at 47. They argue that because breach of peace under District law turns on the totality of circumstances, the disorderly conduct statute can be triggered by "the disruption of traffic and profanely loud and boisterous behavior that causes people to gather, especially late at night." *Id.* at 49.

We think any error infecting the district court's breach-of-peace jury instruction was harmless. The appellants bear the burden of showing prejudice, so we are particularly struck by their theory of the case (and sole argument on appeal), according to which Huthnance breached the peace by "causing a scene that prompted a bus to stop and forced other traffic to slow down or detour around the bus, disturbed people in their apartments . . . so that they turned on the lights and looked out the window, and caused as many as thirteen people to gather on the sidewalks." *Id.* at 50. If the jury had believed this, it would have found for the appellants even under the allegedly erroneous jury instruction, so the appellants' claim to prejudice depends on showing the jury might have credited their evidence about the rubbernecking but *not* their evidence about activity in the nearby apartments—and that the jury might therefore have found for Huthnance. *See Joy*, 999 F.2d at 557 ("[I]t is specious to

claim that the district court's jury instructions prevented the jury from reaching a verdict for Allison if the jury agreed with Allison's theory of the case. If the jury adopted Allison's view . . . it could have held for Allison . . . ."); *cf. United States v. Johnson*, 216 F.3d 1162, 1166 (D.C. Cir. 2000) ("Where there has been an error in instructions, we have held such error to be harmless if the jury necessarily found facts that would have satisfied a proper instruction."). The evidence did not preclude the jury from crediting only a subset of the appellants' evidence, but not only have the appellants proffered no reason to think this credibility distinction is anything other than theoretical, they have given us little reason to think the jury could or would have parlayed the distinction into a favorable verdict.

The appellants have pointed to no evidence that supports their claims about the rubbernecking without also supporting their claims about the neighbors waking up. The arrest report mentioned neither event, and the officers testified about both. Given that the officers' testimony is the only evidence the appellants adduced that positively supports their account, the jury had every reason to take the evidence of rubbernecking and disturbed neighbors as the appellants presented it: all or nothing. The "all," moreover, started weak and ended weaker. The officers failed to present a unified front at trial about the rubbernecking, Huthnance's counsel subjected the officers to a rigorous cross-examination that exposed a number of inconsistencies in their testimony, and the general credibility of the officers' account took a hit when the district court issued the missing witness instruction.

At no point in this process would the jury have had any reason to distinguish between the officers' testimony about rubbernecking and the officers' testimony about the sleepy neighbors. Few of the inconsistencies in the officers'

testimony related to rubbernecking and the neighbors, so we doubt that only the officers' credibility about the neighbors suffered damage; the strikes by Huthnance's counsel were not so targeted. The jury could not have distilled the inconsistencies into a single conclusion about the likelihood that Huthnance disturbed the neighbors' slumber. More plausibly, the jury, considering the officers' credibility both generally and with respect to individual pieces of testimony, drew conclusions about the officers' testimony that swept more broadly. And the missing witness instruction certainly drew no distinction between the constituent pieces in the officers' story. If the jury did not believe Huthnance woke up the neighbors, in other words, it was not because of any evidence unique to the officers' account of those—or any other—facts.

## IV

For the reasons stated, the district court's judgment is

*Affirmed.*

KAVANAUGH, *Circuit Judge*, dissenting: The Court concludes that the missing evidence instruction given at trial was not appropriate. I agree with that conclusion. The next question is whether that error was harmless. The District Court itself recognized that the missing evidence instruction would be "very damaging" to the defendants if the District Court were to give it (as the District Court ultimately did). I agree with that assessment. Because the missing evidence instruction was not appropriate here and because it was "very damaging" to the defendants, I would vacate the judgment and remand for a new trial.