# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 12, 2021        Decided April 2, 2021

No. 19-1180

RADNET MANAGEMENT, INC., D/B/A ORANGE ADVANCED
IMAGING, ET AL.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 19-1181, 19-1182, 19-1183, 19-1184,
19-1191, 19-1192, 19-1193, 19-1194, 19-1195, 19-1203,
19-1207

———

On Petitions for Review and Cross-Applications for
Enforcement of Orders of the National Labor Relations Board

———

*Kaitlin Kaseta Lammers* argued the cause for petitioner.
On the briefs was *Bryan T. Carmody.*

*Heather Beard*, Attorney, National Labor Relations
Board, argued the cause for respondent. On the brief were
*Peter B. Robb,* General Counsel at the time the brief was filed,
*Ruth E. Burdick*, Deputy Associate General Counsel, *David S.*

*Habenstreit*, Assistant General Counsel, *Elizabeth A. Heaney*, Supervisory Attorney, and *Rebecca J. Johnston*, Attorney.

Before: MILLETT, KATSAS and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: RadNet Management, Inc. operates a chain of diagnostic medical imaging centers, including many located in Southern California. In these consolidated petitions for review, RadNet challenges the Board's decisions finding unfair labor practices as a result of RadNet's refusal to bargain with the National Union of Healthcare Workers (the Union) on behalf of six separate bargaining units, each representing certain technical workers employed at a different RadNet facility in Southern California. RadNet does not dispute its refusal to bargain. Rather, RadNet argues that all six certifications are marred by defects in election procedure, election misconduct, or underlying representation issues.

In 2018, the Union petitioned to represent RadNet employees in a single multi-facility unit comprising registered nurses and technical employees employed across more than a dozen RadNet facilities in Southern California. Following a representation hearing, the Board's Regional Director agreed with RadNet that the Union had failed to establish a sufficient community of interest between the employees of separate RadNet facilities; accordingly, he found that multiple single-facility units were more appropriate. On various other representation issues he found in favor of the Union, and he directed separate single-facility elections to occur on October 24th and 25th, 2018. The Union prevailed in the six elections contested here—namely, those concerning RadNet's facilities in Anaheim, Garden Grove, La Mirada, Orange, Irvine, and in

one of two elections held in Santa Ana—and failed in all others. The elections were certified, and following unfair labor practice complaints for RadNet's refusal to bargain, the Board granted summary judgment against RadNet. RadNet petitioned for review, and the Board cross-applied for enforcement. For the following reasons, we deny the petitions for review and grant the cross-applications for enforcement.

## I.

We have jurisdiction to review the petitions and cross-applications under 29 U.S.C. § 160(e) and (f). We will uphold the Board's decisions if they are not arbitrary, capricious, or grounded in legal error, and if substantial evidence supports the Board's factual findings. *Advanced Life Sys. Inc. v. NLRB*, 898 F.3d 38, 43 (D.C. Cir. 2018); *see* 29 U.S.C. § 160(e) & (f). In cases involving questions of representation and unit certification, the scope of our review is "extremely limited." *Amalgamated Clothing & Textile Workers Union v. NLRB*, 736 F.2d 1559, 1564 (D.C. Cir. 1984). We afford the Board "an especially wide degree of discretion" in such cases, and "we will overturn a Board decision to certify an election in only the rarest of circumstances." *800 River Rd. Operating Co. v. NLRB*, 846 F.3d 378, 385–86 (D.C. Cir. 2017) (cleaned up). We also recognize "the basic truth that union elections are often not conducted under ideal conditions, that there will be minor (and sometimes major, but realistically harmless) infractions by both sides, and that the Board must be given some latitude in its effort to balance" the rights of various parties. *NLRB v. Mar Salle, Inc.*, 425 F.2d 566, 571 (D.C. Cir. 1970) (cleaned up). In short, we will not overturn a Board-administered election unless the objecting party can produce "specific evidence" that the alleged defects in election administration "interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the

election." *Amalgamated Clothing Workers v. NLRB*, 424 F.2d 818, 827 (D.C. Cir. 1970) (cleaned up). RadNet's claims are numerous, but it makes no such showing.

## II.

RadNet presses eight objections to the Board's election certifications. Four objections concern two or more bargaining units and elections generally, and four additional objections concern the conduct of individual elections. RadNet also complains about the Board's refusal to allow relitigation of underlying representation issues during the unfair labor practice proceedings. All of RadNet's objections fail because the Board either did not err, or where it did, the error was harmless.

## A.

*First*, RadNet claims that several of the petitioned-for bargaining units were inappropriate because they combined guard and non-guard employees in violation of Section 9(b)(3) of the National Labor Relations Act (NLRA or Act), which prohibits the Board from "decid[ing] that any unit is appropriate . . . if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises[.]" 29 U.S.C. § 159(b)(3). Specifically, RadNet alleges that certain Magnetic Resonance Imaging (MRI) Technologists employed at its Anaheim, Garden Grove, Irvine, Santa Ana, and Orange facilities and certain Nuclear Technologists employed at Orange and Santa Ana[1] were

---

[1] RadNet's opening brief states that the two "Nuclear Medicine Technologists (including Nuclear Medicine / PET Technologists) [were] employed by Irvine and Orange," Br. at 6, but the record

guards within the meaning of Section 9(b)(3), because their duties in enforcing rules related to the safe operation of dangerous equipment. Following a representation hearing, the Regional Director determined that these employees were not guards within the meaning of the Act, and we agree with the Board that the Regional Director did not abuse his discretion.

The Regional Director's decision on this issue was reasoned, consistent with precedent, and supported by substantial evidence. First, the Regional Director made the factual finding that MRI and Nuclear Technologists' primary duties related to medical diagnostics, not safety and security, and any guard-like duties were "merely incidental" to their primary responsibilities. J.A. 1571–73, 1577–78; *cf. Wolverine Dispatch, Inc.*, 321 NLRB 796, 798 (1996) (employees are not guards when their guard-like duties are "incidental" to their primary non-guard duties). The Regional Director also found that the employees at issue lacked many of the "common indicia" of guard status—they "do not carry weapons, clubs, wear uniforms or badges . . . they [are not] physically situated in a security booth . . . [nor do they] receive specialized instructions on what to do in the event that there is a threat to the security of the premises, except that they are to contact the site manager and/or call 9-1-1." J.A. 1577–78; *cf. Boeing Co.*, 328 NLRB 128, 130 (1999) (describing guard-like duties as "those typically associated with traditional police and plant security functions" as evidenced by, among other things, "wearing guard-type uniforms or displaying other indicia of guard status"). In short, the Regional Director's determination on the contested employees' guard status was consistent with Board precedent and easily supported by substantial evidence.

---

indicates—and RadNet's reply brief confirms—that they were employed at Orange and Santa Ana. J.A. 79; *see also* Respondent's Br. at 27 n.11; RadNet Reply Br. at 5 n.2.

*See Bellagio, LLC v. NLRB*, 863 F.3d 839, 847 (D.C. Cir. 2017) (because the question of guard status is "predominantly factual, [] we will disturb the Board's determination only if it is unsupported by substantial evidence") (cleaned up); *see also Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1250 (D.C. Cir. 2012) (giving "substantial deference to inferences the Board draws from the facts") (cleaned up).

**B.**

*Second*, RadNet argues that all the elections were *a priori* defective because they were conducted pursuant to the Board's 2014 revised election rules, *see* Representation-Case Procedures, 79 Fed. Reg. 74308 (Dec. 15, 2014), which, according to RadNet, were facially unlawful.[2] Specifically, RadNet claims that the revised election rules were unlawful because (1) they violate Section 9 of the NLRA by denying employers their right to a pre-election hearing, (2) they violate Sections 7 and 8(c) of the NLRA by restricting employee and employer free speech during a union organizing campaign, (3) they violate federal privacy law and public policy by expanding the requirement for employers to share private employee information, and (4) they were promulgated in a manner that was arbitrary and capricious insofar as the Board considered irrelevant factors in reaching its decision to enact the revised rules. Each of RadNet's claims lacks merit. *See Associated Builders & Contractors of Tex., Inc. v. NLRB* (*ABC*), 826 F.3d 215, 229 (5th Cir. 2016) (rejecting APA challenge to the Board's enactment of the 2014 rules); *Chamber of Commerce*

---

[2] RadNet also purports to advance an as-applied challenge to the 2014 revised rules, RadNet Opening Br. at 45–46, but RadNet fails to articulate any concrete basis for an as-applied challenge as distinct from its facial challenge.

*of U.S. v. NLRB*, 118 F. Supp. 3d 171, 220 (D.D.C. 2015) (rejecting constitutional, APA, and other statutory challenges).

On the question of an employer's Section 9 right to a pre-election hearing, RadNet appears to take issue with (without actually citing to) a provision of the rules stating that "[d]isputes concerning individuals' eligibility to vote or inclusion in an appropriate unit ordinarily need not be litigated or resolved before an election is conducted." 79 Fed. Reg. at 74381 (codified at 29 C.F.R. § 102.64(a) (2015)). This, according to RadNet, is in contravention of Section 9(c)'s requirement that the Board "shall investigate [representation] petition[s] and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice." 29 U.S.C. § 159(c)(1)(B). But neither the statute nor Board precedent guarantees parties an absolute right to pre-election hearings specifically concerning "individuals' eligibility to vote or inclusion in an appropriate unit." Furthermore, this provision of the 2014 revised rules "neither precludes nor prevents the presentation of evidence regarding voter eligibility." *ABC*, 826 F.3d at 222 (cleaned up). The rule simply states that such issues *ordinarily* need not be litigated before an election. *Chamber of Commerce*, 118 F. Supp. 3d at 199. And in any case, RadNet received precisely what it requested: a pre-election hearing on the eligibility of certain voters.

RadNet's argues next that the 2014 rules interfered with protected speech under Sections 7 and 8(c) of the NLRA by shortening the electioneering period. Section 7 of the NLRA guarantees employees the right to organize and bargain through representatives they choose, 29 U.S.C. § 157, and Section 8(c) provides that parties to a labor dispute may generally express their views without such views constituting evidence of an unfair labor practice. *Id.* at § 158(c). But rather than directing

us to any concrete right contained in Sections 7 and 8(c), RadNet merely gestures to the Congress's broader intent, which was to "encourage free debate on issues dividing labor and management." *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 67 (2008) (quoting *Linn v. Plant Guard Workers*, 383 U.S. 53, 62 (1966)). Nor does RadNet explain precisely how the revised rules undermined this intent. The revised rules departed from the Board's prior practice of automatically staying elections in anticipation of requests for review and codified the Board's existing practice of scheduling elections "for the earliest date practicable," *see* 79 Fed. Reg. at 74310, but the rules also explicitly avoided "establish[ing] any rigid timeline for the conduct of the election itself." *Id.* at 74318. And the rules contemplated that the regional director would consider the parties' "opportunity for meaningful speech about the election" in setting an election date. *Id.* RadNet fails to articulate how such general amendments facially conflict with their right to a "free debate" on the issues. And, again, RadNet received the very thing of which it claims to have been deprived—the Board scheduled the elections to occur two full months after the Union filed its petition, which is slightly *more* time than RadNet had originally requested.

RadNet's claims related to the privacy of confidential employee information are no more persuasive. RadNet argues that the 2014 Rules violate "federal privacy law and public policy" by requiring employers to share with unions private employee contact information including email addresses and telephone numbers. RadNet Opening Br. at 44. But as the Board explained in enacting the 2014 rules, courts have long approved of Board rules requiring employers to share with unions private employee information, including the names and home addresses of eligible voters. *See* 79 Fed. Reg. at 74335 (citing *Excelsior Underwear, Inc.*, 156 NLRB 1236, 1239–40 (1966); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 767–68

(1969)). Thus, it was entirely reasonable for the Board to extend information-sharing requirements to cover employees' personal email addresses, *see* 79 Fed. Reg. at 74341, which are hardly more confidential or invasive than home addresses or phone numbers.

That brings us to RadNet's arbitrary-and-capricious challenge, which is a nonstarter. RadNet claims that the Board's enactment of the 2014 revised rules was arbitrary and capricious insofar as it "relied heavily on factors not considered relevant to representation cases by Congress when it wrote the [NLRA], such as speed in scheduling elections, and the facilitation of organized labor." RadNet Opening Br. at 45. But RadNet offers no evidence for this assertion, nor is it obvious that the Congress would consider such factors irrelevant. *See, e.g.*, *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 48 n.15 (1987) (in balancing interests, the Board generally strives to "permit[] employees who wish to be represented as immediate representation as possible" (quoting *Clement-Blythe Cos.*, 182 NLRB 502 (1970)). RadNet also argues that the Board's adoption of new election rules in 2019, which revised some of the 2014 changes, *see* Representation-Case Procedures, 84 Fed. Reg. 69524 (Dec. 18, 2019), rendered the 2014 rules arbitrary and capricious. But agencies can change their policies as long as they provide a reasoned explanation for doing so, *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009), and RadNet makes no argument that the Board failed to provide a sufficient explanation in 2019. And to the extent that an agency's change of heart casts any doubt on a rulemaking, such doubt is more likely cast upon the subsequent rulemaking, not the prior. In short, RadNet's arguments do not come close to overcoming the presumption of validity we are required to apply to an agency's actions when subject to arbitrary and capricious review. *See Envt'l Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981)

("arbitrary and capricious standard of review is a highly deferential one . . . which presumes the agency's action to be valid.") (cleaned up).

## C.

*Third*, RadNet claims that the Board abused its discretion in choosing to postpone the counting of ballots and the disclosure of results until the conclusion of voting in all ten of the individual unit elections. Here, we agree with RadNet that the Board has abused its discretion, but because the error was harmless, we nonetheless deny RadNet's petitions for review. *See 800 River Rd.*, 846 F.3d at 386 ("We will affirm the Board's order to bargain unless the Board abused its discretion in overruling [an employer's] objections, and the abuse of discretion was prejudicial.") (cleaned up).

The Board's error was straightforward: in directing ballots to be impounded and vote tallies to be delayed, the Regional Director departed without reasoned explanation from the Board's prior policy and practice, and the Board summarily affirmed the Regional Director's faulty decision. The Board's own rules and regulations provide that "[u]pon the conclusion of the election the ballots will be counted and a tally of ballots prepared and immediately made available to the parties," 29 C.F.R. § 102.69(a)(7), and Board guidance is similarly clear that "[t]he count of ballots should take place as soon after the close of voting [] as possible." NLRB Casehandling Manual (Part Two) Representation Proceedings § 11340.1 (2020). "Indeed, if [the Board] choose[s] to depart from usual election procedures, they must provide a reasoned explanation." *Nathan Katz Realty, LLC v. NLRB*, 251 F.3d 981, 994 (D.C. Cir. 2001).

Here, too, the Board relies on an insufficient explanation from the Regional Director. First, the Regional Director offered a fairness-based rationale, reasoning that impoundment was

preferable to immediate tallies since "*everyone* would know the outcomes of *all* elections at the same time." *See, e.g.*, J.A. 1604 (emphasis in original). This, according to the Regional Director, would prevent anyone from disseminating information about the results of early elections to influence subsequent elections. The Regional Director did not explain, however, what is objectionable about disseminating presumably truthful information. Second, the Regional Director concluded that "administrative efficiency" favored impoundment and delayed tallying of ballots since "it allowed all parties and their representatives to be present at one designated time in one centralized location to observe the ballot counts" and receive the results. *See, e.g.*, J.A. 1604 n.3. The Board summarily affirmed, adding only that "[u]nder the unusual circumstances of this case, the earliest practicable time at which the count could take place was after the completion of voting in all units." *See, e.g.*, J.A. 1621 n.1. But simply declaring the usual procedure not "practicable" does not make it so, and given that a Board Agent was already required to be present at each separate election, it is not obvious what was so administratively burdensome about separate vote counts immediately following the individual elections, none of which involved more than two dozen eligible voters.[3] When the Board departed from prior policy without providing a reasoned

---

[3] The record shows that Unit G (Anaheim) comprised 12 eligible voters; Unit E (Garden Grove) comprised 9 eligible voters; Unit B (La Mirada) comprised 3 eligible voters; Unit C (Orange) comprised 13 eligible voters; Unit H (Irvine) comprised 6 eligible voters; and Unit J-2 (Santa Ana) comprised 21 eligible voters. *See* J.A. 1139, 1296, 1451, 1589, 1753, 1916. The record does not disclose the number of eligible voters in the uncontested elections where the Union did not prevail, but RadNet asserts that none involved more than two dozen employees. RadNet Opening Br. at 37.

justification, the Board abused its discretion. *See Pittsburgh Press Co. v. NLRB*, 977 F.2d 652, 655 (D.C. Cir. 1992).

The Board's error, however, did not prejudice either party. "In administrative law, as in federal civil and criminal litigation, there is a harmless error rule: . . . the Administrative Procedure Act, 5 U.S.C. § 706, instructs reviewing courts to take due account of the rule of prejudicial error." *Ozark Auto. Distribs., Inc. v. NLRB*, 779 F.3d 576, 582 (D.C. Cir. 2015) (cleaned up). And it is the burden of the party challenging the election to show that "prejudice resulted from the Board's lapses." *Salem Hosp. Corp. v. NLRB*, 808 F.3d 59, 67 (D.C. Cir. 2015) (declining to set aside an election despite "the Board's faulty adherence to its procedure") (cleaned up). "Whether an error is prejudicial 'depends on a number of factors, including the closeness of the case, the centrality of the issue in question, and the effectiveness of any steps taken to mitigate the effects of the error.'" *800 River Rd.*, 846 F.3d at 386 (quoting *Huthnance v. District of Columbia*, 722 F.3d 371, 381 (D.C. Cir. 2013)).

RadNet has failed to show any prejudice from the Regional Director's impoundment decision. First, of the six units that voted in favor of the Union, five did so by healthy margins. *Cf. C.J. Krehbiel Co. v. NLRB*, 844 F.2d 880, 884 (D.C. Cir. 1988) (applying greater scrutiny to the Board's decisions in close elections). One unit—Unit J-2 in Santa Ana—was close, with a vote of 10 in favor versus 9 opposed. But even there, RadNet does not clearly articulate the nature of the prejudice it has suffered. RadNet claims that that it was denied its free speech rights because it could not advertise election results as they occurred. The implication—which RadNet makes explicit in its opening brief, RadNet Opening Br. 35–36—is that early wins by the Union would tend to favor the Union in subsequent elections, since the Union would be able to boast stronger

overall bargaining power with RadNet corporate management, whereas early defeats would tend to disfavor the Union in subsequent elections. But the early results almost uniformly favored the Union, with the Union prevailing in both elections decided at or before 3:30pm on October 24th and five out of six elections decided at or before 6:30pm on October 24th. Thus, if anything, it would appear that it was the Union—not RadNet—that was prejudiced by the Board's impoundment decision. The case is therefore distinguishable from *Nathan Katz*, where the union was defeated in the first of its two same-day elections before prevailing in the second election by the narrowest of majorities. 251 F.3d at 984. And while RadNet proffered two employees willing to "testify that they would have preferred to have known the outcome of any of the other elections" prior to casting votes in their own elections, *see, e.g.*, J.A. 1602, that hardly indicates that prior election results were a central issue in any of the campaigns. Thus, in the absence of a showing of actual prejudice, we decline to set aside the elections on the basis of the Board's impoundment decision.

### D.

*Fourth*, RadNet contends that the elections must be set aside because the Union failed to disclose to employees its alleged affiliation with another union, the International Association of Machinists and Aerospace Workers (IAMAW). Because the "statutory right [to select a bargaining representative] can only be meaningfully exercised if the employees are presented on the election ballot with the choice of a clearly identified labor organization[,]" *O & T Warehousing Co.*, 240 NLRB 386, 386 (1979), the Board will sometimes set aside elections where the evidence supports an inference of voter confusion over the identity of the bargaining representative. *See, e.g.*, *Pac. Sw. Container*, 283 NLRB 79, 80 (1987) (vacating election where, due to a merger of unions, the

sole union listed on ballots ceased to exist prior to certification); *Humane Soc'y for Seattle/King Cty.*, 356 NLRB 32, 35 (2010) (setting aside election where the petitioning union falsely assured employees that they would be represented by their own independent union, resulting in a "strong showing of employee confusion over the identity of the organization seeking representative status"). Less frequently, the Board sets aside elections where issues of union affiliation contribute to voter confusion. *See, e.g.*, *Woods Quality Cabinetry Co.*, 340 NLRB 1355, 1356 (2003) (setting aside election where petitioning union affirmatively misrepresented itself as affiliated with the AFL-CIO and affiliation issue was "material to the election campaign"); *cf. Nev. Sec. Innovations, Ltd.*, 337 NLRB 1108, 1109 (2002) (declining to set aside election where employees received a letter from a local affiliate union erroneously stating that it too would participate in their representation but where the letter was unlikely to generate widespread voter confusion).

The circumstances here are not so extreme: even crediting RadNet's allegation of an undisclosed affiliation, there is no evidence that the Union affirmatively misrepresented its affiliation with IAMAW or that the Union's relationship with IAMAW or any other union was at all material to the election campaign. Nor is there any indication that the voters were confused as to the identity of their prospective bargaining representative. Rather, as the Board found in its certification decision, the Union was "the sole labor organization seeking to represent the employees," and "[n]o other labor organization claimed or attempted to claim any interest in representing the employees in the units." J.A. 1606. Accordingly, the Board did not abuse its discretion by overruling RadNet's union affiliation objection, and in any event, RadNet has shown no prejudice.

15

**E.**

*Fifth*, RadNet raises four separate objections concerning the conduct of individual elections. In Irvine, RadNet alleges that the Board Agent failed to maintain security of the ballot box and that the Union observer continuously used her cellular telephone during the election and in the vicinity of voters. In Santa Ana, RadNet alleges that the Board Agent failed to post the proper "Voting Place" sign prior to the start of the election. And in Garden Grove, RadNet alleges that the Board agent permitted a pro-Union employee to loiter in the polling area and attempt to engage the Union observer in a conversation about workplace issues. The Regional Director overruled all four objections without a hearing, and the Board affirmed, also without a hearing.

We review the Board's decision to overrule post-election objections under the deferential abuse of discretion standard. *Amalgamated Clothing Workers*, 424 F.2d at 827 ("The only question presented on judicial review is whether the Board has reasonably exercised its discretion in the matter."). To succeed in overturning an election, "the objecting party must produce specific evidence that the election was improperly conducted and that the acts complained of interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election." *Id.* (cleaned up). "In short, there is a heavy burden on the [objecting party] in showing that the election was improper." *Id.* Nor does the objecting party possess an "automatic right" to a post-election hearing on all objections properly lodged. *Durham Sch. Servs., LP v. NLRB*, 821 F.3d 52, 58 (D.C. Cir. 2016) (cleaned up). Rather, "[w]hen a party's evidence, even if credited, would not justify setting aside the election," the Board may overrule the objection without a hearing. *Id.* (cleaned up)*; see also Amalgamated Clothing Workers*, 424 F.2d at 829. Here, even assuming the

veracity of RadNet's factual allegations, we are unpersuaded that the Board abused its discretion in overruling the objections, and we see no specific evidence of prejudice to the fairness of the election.

Starting with the Irvine ballot box security objection, RadNet asserts that the "Board Agent failed to maintain the security of the ballot box, insofar as the ballot box was consistently out of her line of sight." J.A. 1758. In support of its claim, RadNet would have offered testimony from its own election observer to the effect that "for nearly the entirety of [the election]" the Board Agent was "seated in a chair that faced a wall and her back was turned to the entrance . . . and the ballot box . . . [and] had her head down and was reading a newspaper [and/or] using a cellular telephone." J.A. 1063. Without question, failure to maintain ballot box security can constitute grounds for setting aside an election. *See, e.g.*, *Austill Waxed Paper Co.*, 169 NLRB 1109, 1109–10 (1968). Even in cases where physical custody of the ballot box was compromised, however, the Board has declined to set aside the election unless the facts support a reasonable inference of ballot box tampering. *See, e.g.*, *Polymers, Inc.*, 174 NLRB 282, 283 (1969) (declining to set aside election where Board agent failed to retain continuous physical custody of the ballot box and blank ballots, but "the security afforded these items was such that there was only the most remote possibility that anything untoward occurred"), *enforced*, *Polymers, Inc. v. NLRB*, 414 F.2d 999, 1001 (2d Cir. 1969); *Dunham's Athleisure Corp.*, 315 NLRB 689, 689 (1994) (declining to set aside election where employer's observer could not see ballot box and box was left "virtually unattended" for more than two-thirds of the voting period, but there was otherwise no affirmative indication of tampering). Here, RadNet offered no affirmative evidence of ballot box tampering, and tampering in the Union's favor was all the more unlikely given the presence

of RadNet's election observer, *see* J.A. 1772–73. *Compare Elizabethtown Gas Co. v. NLRB*, 212 F.3d 257, 267–68 (4th Cir. 2000) (declining to overturn election where Board agent left ballot box unattended and unsecured but other observers were present and observed no tampering), *and Benavent & Fournier, Inc.*, 208 NLRB 636, 636 n.2 (1974) (same), *with Austill Waxed Paper Co.*, 169 NLRB at 1109–10 & n.2 (setting aside election where ballot box was left "wholly unattended" after observers were drawn away by an altercation occurring outside the polling place). The Board's dismissal of RadNet's objection was in keeping with precedent.

The Board's decision on the Irvine cell phone objection was similarly consistent with Board precedent. RadNet alleges that the Union's observer "continuously" used her cellular phone during the Irvine election in violation of the Board agent's instructions and in plain view of eligible voters. J.A. 1758. RadNet also claims, "upon information and belief," that the Union observer used her cellphone at least in part for the purpose of contacting potential voters. *Id.* at 1758–59. The implication, it seems, is that the Union observer may have used her cell phone in order to keep (or communicate with others who were keeping) a list of eligible voters. The only evidence offered, however, was testimony from RadNet's own observer, who would have testified that the Union observer "continuously" used her phone, sent text messages, and received at least one call during the election. J.A. 1063–64.

Even crediting RadNet's allegations, the Board was justified in overruling RadNet's cell phone objection. RadNet appeals to Board guidance and precedent prohibiting parties' election observers from making lists of voters "who have or have not voted," Casehandling Manual § 11322.1; *Int'l Stamping Co.*, 97 NLRB 921, 922–923 (1951) (setting aside an election where agent for the employer kept a list of voters), and

RadNet is correct that, under Board precedent, a reasonable perception of list-keeping may be enough to overturn an election, *see Piggly-Wiggly #011*, 168 NLRB 792, 793 (1967) (setting aside election where union agent had a sheet of paper in hand, and employees were able to observe him notating the names of those who had voted). But conversely, the Board will not disturb an election where voters were not aware of potential list-keeping. *See A.D. Juilliard & Co.*, 110 NLRB 2197, 2199 (1954). Because RadNet offered no evidence of actual or even perceived list-keeping, the Board reasonably overruled the objection.

RadNet's Santa Ana objection—alleging that the Board Agent failed to post any "Voting Place" signs in connection with the election—is no more successful. RadNet appeals to the Board's non-binding Casehandling Manual, which directs Board agents to examine the polling place prior to the election and to post "Voting [P]lace" signs "if needed." *Id.* § 11318. Board precedent clearly provides, however, that the Board "do[es] not invalidate elections based on minor deviations from the guidelines," including an agent's failure to place "Voting Place" signs. *See Pac. Grain Prods.*, 309 NLRB 690, 690–91 & n.5 (1992) (specifically declining to set aside an election because the Board Agent failed to post "Voting Area" signs); *see also Hard Rock Holdings, LLC v. NLRB*, 672 F.3d 1117, 1123 (D.C. Cir. 2012) (Board Agent's failure to follow Casehandling Manual's guideline that observers wear a badge did not warrant setting aside election). The Board's decision on the Santa Ana objection was consistent with this precedent.

Last, the Board did not abuse its discretion in overruling the Garden Grove objection. There, RadNet alleges that the Board agent permitted a pro-Union employee to loiter in the polling area and to attempt to engage the Union observer in approximately two minutes of conversation about "workplace

subjects, such as patient procedures and patient work flow." J.A. 1042; *see also id.* at 1301–02. This, according to RadNet, is a violation of the so-called *Milchem* rule, which holds that a party's "sustained conversation with prospective voters waiting to cast their ballots, regardless of the content of the remarks exchanged," is grounds for setting aside an election. *Milchem, Inc.*, 170 NLRB 362, 362 (1968); *accord Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 269–70 (D.C. Cir. 1998). But the Board, crediting RadNet's allegations, determined that *Milchem* did not apply, and we agree. First, no party engaged in a sustained conversation *with prospective voters*. At most, RadNet alleges only a brief conversation between a non-voting employee and a Union observer. Second, even assuming *Milchem* were to apply to conversations between non-voting employees and party observers, the alleged conversation consisted of little more than a "chance, isolated, innocuous comment or inquiry"—just the type of conversation that *Milchem* exempts. *Milchem, Inc.*, 170 NLRB at 363. Accordingly, the Board did not abuse its discretion in overruling the Santa Ana objection, and even if it had, RadNet produces no evidence of actual prejudice.

## F.

*Finally*, we briefly dispatch with RadNet's argument that the Board abused its discretion in granting summary judgment to the General Counsel without allowing relitigation of certain underlying representation issues. RadNet's argument is without merit. The Board was merely following its "well[-]settled" rule that, "in the absence of newly discovered or previously unavailable evidence, the Board will not relitigate in a subsequent refusal-to-bargain proceeding matters which have been disposed of in a prior related representation case." *Pepsi-Cola Buffalo Bottling Co.*, 171 NLRB 157, 158 (1968). The basic rule, moreover, has long been met with judicial

approval. *See, e.g.*, *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 162 (1941); *NLRB v. Mar Salle, Inc.*, 425 F.2d 566, 572 (D.C. Cir. 1970). To the extent that the Board has occasionally departed from its rule against relitigation, *see, e.g.*, *Sub-Zero Freezer Co.*, 271 NLRB 47, 47 (1984), such exceptions merely demonstrate that the Board *may*—exercising appropriate discretion—allow relitigation in certain cases, particularly when the alleged pre-election misconduct is so severe that it calls into question whether the election was "free and fair." *See id.* Absent similarly extreme circumstances, the Board reasonably hewed to its general rule against relitigation.

## III.

We deny the petitions for review and grant the cross-applications for enforcement.

*So ordered*.