# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 23, 2015          Decided May 20, 2016

No. 14-1166

MANORCARE OF KINGSTON PA, LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 14-1200

———

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board

———

*Charles P. Roberts, III* argued the cause for petitioner.
With him on the briefs was *Clifford H. Nelson, Jr.*

*Kellie Isbell,* Attorney, National Labor Relations Board,
argued the cause for respondent. With her on the brief were
*Richard F. Griffin, Jr.*, General Counsel, *John H. Ferguson*,
Associate General Counsel, *Linda Dreeben*, Deputy Associate
General Counsel, *Usha Dheenan*, Supervisor Attorney, and
*Gregoire Sauter*, Attorney.

Before: BROWN AND SRINIVASAN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion filed for the Court by *Circuit Judge* BROWN.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* SRINIVASAN.

BROWN, *Circuit Judge*:   Employees of ManorCare of Kingston (ManorCare), a skilled-nursing facility in Kingston, Pennsylvania, selected the Laborers International Union of North America, Local 1310 as their collective-bargaining representative.   Because ManorCare alleges third-party misconduct disrupted the election, it challenges the National Labor Relations Board's order requiring it to bargain with the union.   On the basis of the Board's own precedent, we determine the third-party conduct here was sufficiently disruptive to undermine the conditions necessary for a free and fair election.  We grant ManorCare's petition in part and grant the Board's cross-application in all other respects.

**I**

In the summer of 2013, the Laborers International Union of North America began to organize the employees of ManorCare's Kingston facility. By August 1, 2013, ManorCare and the union had reached a stipulated agreement to conduct an election limited to a unit of certified nurses' aides. The Board scheduled an election at ManorCare for September 6, 2013. The union eked out a narrow victory—thirty-four in favor and thirty-two against.

ManorCare objected to the election results a week later, claiming several employees eligible to vote in the election threatened to physically harm other employees and harm their

property—a circumstance the company alleges destroyed the "laboratory conditions" necessary for a fair and free election. After an initial investigation, the Board's regional director ordered a hearing on the objections.

Most relevant here, ManorCare called two witnesses at the hearing, Harriet Robinson and Amy Kovac, to testify about alleged threats made by two other employees, Lucy Keating and Juanita Davis.

*The Keating Threat.* Robinson, a ManorCare nurse, testified that shortly after the election petition was filed, she was on a smoke break with Keating, another ManorCare nurse, when Keating said "if the Union didn't get in … if we started bitching[,] that she was going to start punching people in the face." JA 599. At the time, Robinson was not afraid because she knew she could defend herself. But later, during the days and weeks immediately before the election, Robinson told other employees about what Keating had said. Three employees (Kim Lord, Keisha Keller, and Kovac) testified about what Robinson told them, which included Robinson's statements that someone had made physical threats against employees who would not support the union. Keating also testified and denied making the alleged threatening statements.

*The Davis Threat.* Robinson also testified that on the day before the election, she and three other nurses, Kovac, Krista Renfer, and Davis, were walking together in the parking lot when Davis started yelling that "if the Union didn't get in that she was going to start beating people up and destroying their cars." JA 601. According to Robinson, Kovac replied to Davis that "she didn't think she would beat her up, but if her car got damaged, she was coming after [Davis] for that." *Id*. At the time, Robinson did not report the matter to her

4

supervisor because she felt she could handle the situation herself but later thought better of it and reported the incident the following day.

Kovac told a similar story. Kovac testified that she, Robinson, and Renfer were standing in an employee smoking area when Davis "came out of work and says she was going to slash our tires if we voted no for the Union." *Id*. Kovac initially thought Davis was joking but upon reflection she changed her mind.

Pam Brittain testified that on the morning of the election, Robinson was "very upset, very distraught," and also "nervous" and "scared." *Id*. When asked, Robinson explained that the previous night, Davis said "if somebody voted no, and they were upset because we were [understaffed], that she was going to go after that person, and beat them up and then go after their cars." *Id*. Brittain insisted that Robinson report the incident. Together, they told Director Mark Fuhr, and separately Brittain related Robinson's story to four other employees. Several of these employees corroborated Brittain's recollection. ManorCare also presented several other managers and supervisors who testified they had heard about threats for not supporting the union made against employees and their property. For example, one manager testified that on the morning of the election she noticed "clusters" of voting-eligible employees standing around and "chitchatting" about their concern that their cars would be damaged if they voted against union representation. JA at 602.

Davis also testified and denied making threatening statements, although she acknowledged that she had said "if you voted no then you shouldn't complain about, you know, whatever happens after that." *Id*. When asked if she had

threatened physical violence to any employees, Davis answered: "Physically hurt? Not really." JA 603. It was also widely known that Davis had been in violent altercations in the past, and in fact, at the time, she had a hand injury from a knife fight.

A few weeks later, the hearing officer issued a written decision sustaining ManorCare's objection. The hearing officer credited Robinson's and Kovac's testimony about the statements Davis made, and the hearing officer did not credit Davis's denial of those statements, which she found "vague," "inconsistent," and "evasive." JA 603. Plus, "Davis herself admitted that a few days after the incident, she told another employee that security had been provided in the parking lot because of her." *Id*. As to the context surrounding the statements, the hearing officer did not credit Robinson's testimony (which included Davis yelling the alleged threats), but instead credited the testimony of Kovac and Davis, who described the conversation as occurring in at least a somewhat joking manner.

Ultimately, the hearing officer concluded that "the statements by Davis and Keating were 'so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible.'" JA 604, (quoting *Westwood Horizons Hotel*, 270 NLRB 802, 803 (1984)). The threats "dealt with serious subjects—harm to person and property," and although they reached a relatively small number of employees, the election was so close that "had just one voter" voted differently, "the [u]nion would not have prevailed in the election." JA 604. Although the threats were initially stated in a casual manner, they were repeated to other employees out of context and prompted ManorCare to provide additional security for three days following the election. *Id*. Cumulatively, the hearing officer concluded that

these circumstances required sustaining ManorCare's objection to the election results.

The union appealed to the Board, raising several exceptions to the hearing officer's findings.  The union argued the hearing officer erred by crediting what it believed to be the conflicting testimony of both Robinson and Kovac and by determining that the threats so aggravated the election atmosphere as to render a free election impossible.  The union also alleged that any dissemination occurred when ManorCare's representatives restated the threatening statements.

The Board agreed with the union and rejected the hearing officer's findings about the threatening statements. The Board emphasized the hearing officer's conclusion that the threats were initially made in a casual or even light-hearted manner and stated that as a result, "neither [threatening statement] rose to the level of objectionable third-party threats." *Manorcare of Kingston PA, LLC,* 360 NLRB No. 93 (Apr. 24, 2014). The Board recited the test for threatening statements laid out in its *Westwood Hotels* decision, on which the hearing officer had also relied.  But in doing so, the Board relied on additional factors: that the threats were made by third parties and circulated without their original context. *Id*. Rather than evaluate whether these circumstances could nevertheless create a threatening situation capable of influencing voting employees, the Board determined that a "game of telephone" should never be the basis for a sustained objection against a union election. *Id*. The Board relied on the vote tally without acknowledging the close decision in the election, and based on that tally certified the union as the exclusive collective-bargaining representative of ManorCare's employees.  *Id*.

Following the Board's decision, ManorCare refused to recognize or bargain with the union. The union charged ManorCare with violating the National Labor Relations Act by unlawfully refusing to bargain. *See* 29 U.S.C. § 158(a)(5). The Board agreed. *Manorcare of Kingston PA, LLC,* 361 NLRB No. 17 (Aug. 11, 2014). ManorCare filed a petition in our court challenging the Board's order, and the Board filed a cross-petition to enforce it. *See* 29 U.S.C. § 160(e), (f).

**II**

We review the Board's findings under a deferential standard, *NLRB v. Downtown Bid Servs. Corp.*, 682 F.3d 109, 112-13 (D.C. Cir. 2012), but we will reverse the Board's decision if it is not "reasonable and consistent with applicable precedent," *Fashion Valley Mall, LLC v. NLRB,* 451 F.3d 241, 243 (D.C. Cir. 2006). Here, we apply our usual deferential standard, but find the Board's decision to be irreconcilable with the Board's own precedent. In that circumstance, we have no choice but to reverse.

The Board has drawn a firm line that an election cannot stand where the results do not reflect the employees' free choice. *General Shoe Corp.*, 77 NLRB 124, 127 (1948). The Board has further determined that threats that create a "general atmosphere of fear and reprisal" render a free election impossible. *Westwood Horizons Hotel*, 270 NLRB 802, 803 (1984). Threats will interfere with a free election when they are "serious and likely to intimidate prospective voters to cast their ballots in a particular manner." *Id*. The question here is whether the comments made by Davis and Keating and disseminated to other voting employees in a very close election crossed the line, becoming threats that made a free election impossible. We conclude that the Board abused

8

its discretion here by finding that the threats did not create a "general atmosphere of fear and reprisal" according to the Board's own precedent. *See id; see also Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 119, 123 (D.C. Cir. 2001) (holding the Board's cursory departure from precedent rendered its decision arbitrary and capricious).

Under the Board's *Westwood Hotel* precedent (on which it relied in issuing its decision here), there are six factors used to determine whether a threat is serious and likely to intimidate voters: "[1] the nature of the threat itself . . . [2] whether the threat encompassed the entire bargaining unit; [3] whether reports of the threat were disseminated widely within the unit; [4] whether the person making the threat was capable of carrying it out; . . . [5] whether it is likely that the employees acted in fear of his capability of carrying it out; and [6] whether the threat was 'rejuvenated' at or near the time of the election." *Westwood Hotel*, 270 NLRB at 803. Here, the analysis of each of these six factors points to an election that fell short of the free and fair standard set out in the Board's precedent.

*Westwood Hotel* begins by considering "the nature of the threat itself." *Id*. Here, Keating and Davis each made statements that, on their face, threatened physical harm and property damage to non-supporters of unionization. "[P]unching people in the face," JA 599, "beating people up and destroying their cars," JA 601, and "slash[ing] [their] tires," *id*., are serious threats, and if believed, these threats would be clearly capable of changing the behavior of other voting members of the bargaining unit. Indeed, some of the threatening statements in this case are identical to those in *Westwood Hotel*, where some employees threatened to "beat up" those who did not support the union. *Westwood Hotel*, 270 NLRB at 802. It is clear

that, in its review of these facts, the Board misapplied its own precedent.

Next, *Westwood Hotel* asks "whether the threat encompassed the entire bargaining unit." *Id.* Keating and Davis's threats were indiscriminate in their focus, aimed not at any particular individual but instead at all of the voting employees "if the Union didn't get in." JA 599, 601. Here again, the facts of this case line up with those of *Westwood Hotel*. In *Westwood Hotel*, two employees threatened to beat up any other employee in the unit who did not vote for the union. *Id.* That type of broadly aimed threat was sufficient to damage the free and fair election atmosphere and require a new election.

Relatedly, *Westwood Hotel* also considers whether the threats were "disseminated widely within the unit," *id.*, and here they were. About eight or nine employees heard about Davis's threatening statements, and around five employees heard Keating's. And in an election as close as this one—where only a single voter could have changed the outcome—the requirement of "widespread dissemination" is satisfied at a relaxed threshold. *Robert Orr-Sysco Food Servs., LLC*, 338 NLRB 614, 615 (2002); *Smithers Tire & Auto. Testing of Texas, Inc.*, 308 NLRB 72, 73 (1992). The Board insists that any comment relayed with less than stenographic accuracy cannot count as dissemination. But this view is inconsistent with the Board's own precedent, *see, e.g., Q.B. Rebuilders*, *Inc.* 312 NLRB 1141, 1142 (1993) (any humor attached to initial remark was diluted over the course of its dissemination), and would preclude a finding of dissemination in most cases. Here, in reaching its conclusion, the Board did not follow its own precedent: the threatening statements were disseminated widely enough to have affected the outcome of the election.

Looking to "whether the person making the threat was capable of carrying it out," the facts of this case again satisfy the *Westwood Hotel* inquiry. The record gives no reason to doubt that both Keating and Davis, but particularly Davis, were capable of delivering on the threatening statements they made. Although Robinson did not credit Keating's threat to "start punching people in the face" in the moment, largely because Keating is small and Robinson is tall, that does not mean Keating would have been unlikely to carry out her threat against others who also heard about the statement. Most people are physically capable of delivering a punch to another person's face, and the record gives no indication why Keating would have been entirely incapable of making good on her threat. But even if Keating were not capable of "punching people in the face" in the way she suggested, it is clear that Davis was capable of making good on the threatening statements she communicated to other employees. It was widely known that Davis had been in fights in the past and, in fact, at the time of the election bore a hand injury resulting from a knife fight. Employees would have had every reason to assume Davis could punch people and damage their cars if she chose.

Another *Westwood Hotel* factor is "whether it is likely that employees acted in fear of [the speaker's] capability of carrying out the threat." *Westwood Hotel*, 270 NLRB at 803. Although the statements from Davis and Keating were probably "not intended to induce fear to the audience who heard them . . . the remarks were repeated to employees who were not in a position to judge how the remarks were intended" and those employees "could not have known that Davis . . . would not have followed through on her threat." JA 604. That employees experienced real fear is only confirmed by the fact that ManorCare hired parking lot

security for three days following the election based on Davis's threats to employees' cars. Nefarious intentions or not, it is apparent from the evidence that employees were likely to have acted in fear of the threatening statements Davis made.

Lastly, "whether the threat was 'rejuvenated' at or near the time of the election," *Westwood Hotel,* 270 NLRB at 803, has limited application here: there was no need for "rejuvenation" in this case because the threats occurred for the first time in close proximity to the election. Given that the threats were stated and disseminated close in time to the election, we find this factor satisfied as well.

Rather than analyze these factors as *Westwood Hotel* requires, the Board cursorily acknowledged its own precedent and then dismissed the effect of the threatening statements in a discussion too brief to demonstrate how the facts of this case align with the Board's precedent. Such truncated analysis may often encourage reviewing courts like this one to affirm the Board's decisions because the reasoning is so skeletal as to thwart assessment of its reasonableness. But this habit would shortchange the obligations of reviewing courts. It is the Board that must demonstrate its decisions are consistent with its precedent because, although our standard of review is deferential, it is not meaningless. Here, the Board has given us little to evaluate, and the record demonstrates that the Board's decision was inconsistent with its own precedent in the form of *Westwood Hotel*.

Moreover, when the Board concluded the threatening statements here were merely jokes, it failed to follow its precedent in another way. The Board's test for determining whether a statement constitutes a threat is an objective

one. "The test is *not* the actual intent of the speaker or the actual effect on the listener," but "whether a remark can reasonably be interpreted by an employee as a threat." *Smithers Tire,* 308 NLRB at 72. A threatening statement, "even one uttered in jest," can nonetheless convey a risk to another of serious harm. Here, the Board emphasized the "casual and joking nature" of the original comments and dismissed the threatening content of those remarks as "no more than bravado and bluster." *Manorcare*, 360 NLRB No. 93. But although Keating and Davis may have intended their remarks in jest, some employees interpreted the remarks as threats, and it was reasonable for them to do so. That the comments might have originated as jokes is irrelevant. The remarks were threatening, and seriously so. The objective standard demanded by the Board's precedent requires assessing the threats according to what they reasonably conveyed, not what the speakers intended to convey.

Nor does it matter, as the Board thought it did, that the threats were disseminated by third parties. The Board has repeatedly found "that voting-related threats of substantial harm" to persons or property "directed at a determinative number of voters create an atmosphere of fear and reprisal sufficient to set aside an election." *Robert Orr,* 338 NLRB at 616. And the Board has made clear that "conduct disruptive or destructive of the exercise of free choice by the voters . . . regardless of whether the person responsible for the misconduct is an agent of a party to the election or simply an employee…" may warrant setting aside results and holding a new election. *Westwood Hotel*, 270 NLRB at 804. In fact, the Board has not hesitated to "set aside elections where, as here, threats have been made *or disseminated* to voters whose ballots might have been determinative." *Robert Orr*, 338 NLRB at 615 (emphasis added). The Board did not even

acknowledge this precedent, let alone distinguish it. The threatening statements Keating and Davis made were addressed and disseminated to enough employees to sway the outcome of this election. That is enough to warrant setting aside the election result. "The Board's decision is *not* consistent with its past practice" and its "departure from precedent without a reasoned analysis renders its decision arbitrary and capricious." *Honeywell Int'l*, 253 F.3d at 123.

In its submitted briefs—but not in its decision—the Board relied on several cases that are clearly distinguishable. In *Beaird-Poulan Div., Emerson Elec. Co. v. NLRB*, 649 F.2d 589 (8th Cir. 1981) an administrative law judge credited five of twenty alleged instances of misconduct, including at least one threatening statement similar to the statements made here. 649 F.2d at 593. The Board's agreement that these incidents did not warrant overturning the challenged representation election, *id*. at 594, rested on the conclusion the five credited incidents constituted "empty threats," "occurring during a ten-week election campaign" that involved "over 800 eligible voters." *Id*. at 595. Here, employees testified that they interpreted the threatening statements as real threats backed by the pugnacious reputation of one of the speakers, the statements occurred close to the election, and they were disseminated to a significant proportion of a much-smaller electorate in a very close election.

The Board does no better with its reliance on *NLRB v. Bostik Div., USM Corp.*, 517 F.2d 971 (6th Cir. 1975). In *Bostik*, the Sixth Circuit affirmed the Board's evaluation of twenty incidents—including twelve threats—that occurred during the course of a representation election. The Sixth Circuit agreed that the threats "were not considered or intended seriously" and included exchanges

between two employees who "always kidded and joked around with each other a lot." 517 F.2d at 973. The Sixth Circuit found the threats nothing more than the banter common "among workers in an industrial setting" and the objects of this jocular invective all testified they were not intimidated and voted against the union. *Id*. at 973-74. Here, none of the employees gave any indication that they had previously "kidded or joked around" with Davis or Kovac. Nor is there any indication the alleged threats were simply profanities or expressions common in the workplace. And, unlike in *Bostik*, the employees who discounted the threatening remarks in the moment of their utterance, reconsidered their import and later came to consider them serious threats.

Finally, the Board's reliance on *Kux Mfg*. *Co*. *v. NLRB*, 890 F.2d 804, 810 (6th Cir. 1989) is also easily distinguishable from the present case. In *Kux Manufacturing,* the employer objected to the certification of the representation election on multiple grounds, including threats allegedly made by a union-sympathizing employee. But the threatening remarks were bravado: they were only heard and discussed by two employees and not widely disseminated, nor taken seriously as they were here where the employer increased security—leading one of the speakers to brag about eliciting that response. Here, the threats crossed the line from bluster and playful profanity to intimidation.

## III

ManorCare also challenges the legitimacy of the Regional Director's election supervision. The Board appointed Dennis P. Walsh as Regional Director during a period in which the Board lacked a quorum, as later

determined by *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014). ManorCare argues that, as a result of the Board's lack of a quorum when it appointed Walsh, his actions as Regional Director were "null and void," including his certification of ManorCare's election result. The Board, however, argues that ManorCare waived any arguments about the Regional Director's authority by not raising them in the representation proceeding. The Board further points out that, even if ManorCare had not forfeited its right to challenge Walsh's appointment by failing to raise it in the representation proceeding, it also signed a Stipulated Election Agreement in which it expressly consented to Walsh's oversight of the election.

Although challenges to an agency's action based on the agency's lack of authority may ordinarily be raised for the first time on appeal, *see SSC Mystic Operating Co. v. NLRB,* 801 F.3d 302, 308–09 (D.C. Cir. 2015), and *UC Health v. NLRB,* 803 F.3d 669, 672–73 (D.C. Cir. 2015), ManorCare's argument is different, depending not on a challenge to institutional legitimacy but on a challenge to a delegated officer's appointment. Here, the Board was properly constituted when the election took place and throughout the relevant review period. The challenge, then, does not confront the institutional legitimacy of the Regional Director's exercise of delegated authority at a time when the Board lacked a quorum. Rather, the challenge is to the Regional Director's initial appointment, and a challenge to an officer's appointment or the authority of a body to decide a claim is subject to forfeiture. *See United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37 (1952) (rejecting belated challenge to appointment of hearing examiner); *see also*, *e.g.*, *United States v. Olano*, 507 U.S. 725, 731 (1994) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited by the failure to make

timely assertion of the right.") (citation omitted); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2472, p. 455 (1971) (Forfeiture is "not a mere technicality and is essential to the orderly administration of justice."). Here, the Board acted reasonably in determining that ManorCare had forfeited this argument.

The Board further points out that ManorCare signed a Stipulated Election Agreement in which it expressly consented to Walsh's oversight of the representation election, thus likely dooming its challenge even if it had been raised to the Board in the representation proceeding. ManorCare cannot now complain about the authority of the supervisor it agreed to use. And because the Stipulated Election Agreement signed by the parties starkly limited any discretion the Regional Director may have had in setting the terms of the election, his supervisory role here was *de minimis*.

ManorCare suggests it would have been futile to challenge Walsh's appointment at this early stage because the Board processed cases even during the *Noel Canning* interregnum as if it was duly configured. But this overlooks Board rules which allow the General Counsel to transfer an election petition to a different region where the legitimacy of the Regional Director's appointment is not in doubt. *See* 29 C.F.R. § 102.72; *see*, *e.g.*, *Lyric Opera of Chicago*, 322 NLRB 865, 865 n.1 (1997) (noting that the General Counsel transferred representation proceedings from Region 13 to Region 19 for decision). Moreover, as is clear from the record, by the time the Board heard ManorCare's objections to the election and then certified that election, the Board was operating with a fully confirmed quorum. The Board decision here appealed suffered from no jurisdictional defect. We reject ManorCare's contention that any interim illegitimacy in

the Regional Director's appointment warrants a new election.

In *Advanced Disposal Servs. East, Inc. v. NLRB,* 2016 WL 1598607 (3d Cir. Apr. 21, 2016) , the Third Circuit relied on *UC Health and SSC Mystic* to reject the Board's arguments that an employer's challenge to the authority of a Regional Director to conduct a representation election was forfeited, or alternatively, the parties had agreed to the Regional Director's authority to conduct the election when the stipulated election agreement was signed and submitted. The Third Circuit held that, because the Board lacked a quorum at the time of the Regional Director's appointment, the employer's challenge to the Regional Director's authority to act constituted an extraordinary circumstance under 29 U.S.C. § 160(e), and did not need to be raised before the Board first.

But our prior decisions in *UC Health* and *SSC Mystic* found that "extraordinary circumstances" existed because "challenges to the composition of an agency can be raised on review even when they are not raised before the agency." *UC Health*, 803 F.3d at 672–73. Here, because ManorCare's challenge is not to the Board's ability to exercise its authority but rather to Walsh's authority to conduct the election—authority that was exercised *after* the Board "once against consist[ed] of sufficient members to constitute a quorum," *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 476 (D.C. Cir. 2009)—this case does not raise a "challenge to the composition of an agency." Thus, there are no "extraordinary circumstances" at play here.

## IV

Because the Board arbitrarily departed from its own analytical framework for evaluating the allegations of third-

party electoral misconduct, we grant ManorCare's petition in relation to that issue, and grant the Board's cross-application for enforcement in all other respects.

*So ordered.*

SRINIVASAN, *Circuit Judge*, *concurring in part* and *concurring in the judgment*: I fully agree with Part III of the court's opinion, in which the court concludes that ManorCare forfeited its challenge to the Regional Director's authority. With regard to Part II of the opinion, I agree with my colleagues that the Board's decision in this case was too cursory, in that the Board at least needed to do more to explain how its decision in this case fits with its precedent. Unlike the majority, however, I do not understand the Board's decision declining to set aside the election to be irreparably inconsistent with its prior decisions. Rather, I would remand the case to enable the Board to explain how its rejection of petitioner's election objection aligns with its precedent.

As a preliminary matter, "our review of the Board's rulings regarding [an] election is 'extremely limited.'" *NLRB v. Downtown Bid Servs. Corp.*, 682 F.3d 109, 112 (D.C. Cir. 2012) (quoting *Amalgamated Clothing & Textile Workers Union v. NLRB*, 736 F.2d 1559, 1564 (D.C. Cir. 1984)). If "the Board's decision to certify a union is consistent with its precedent and supported by substantial evidence in the record, we may not disturb it." *Id.* And because of the Board's "particular expertise" in assessing whether the original election or a new election would better reflect employees' free choice, the Board has "particularly broad discretion" in deciding whether to rerun a representation election. *Amalgamated Clothing & Textile Workers Union*, 736 F.2d at 1562–63.

In reviewing whether the Board's decision is "consistent with its precedent," *Downtown Bid*, 682 F.3d at 112, the court today appropriately focuses on the Board's *Westwood Horizons Hotel* decision, which frames the test for overturning an election result based on third-party misconduct. Under that test, the Board examines "whether the misconduct was so aggravated as to create a general atmosphere of fear and reprisal rendering a free election

2

impossible." 270 NLRB 802, 803 (1984). The decision in *Westwood Horizons Hotel* sets forth specific factors to guide the inquiry into whether that overarching standard is satisfied. *See* pp. 7–10, *supra*. Here, the Board concluded that the misconduct did not meet that standard and thus did not require rerunning the election.

In reaching that conclusion, however, the Board did not adequately ground its rationale in its precedent. Although the Board initially listed the factors set forth in *Westwood Horizons Hotel* for assessing the seriousness of a third party's threatening statements, the Board undertook no application of those factors to the facts of this case, even though the hearing officer, applying the same factors, concluded that they warranted setting aside the election. The Board observed that the statements at issue were initially made in a joking or casual manner and amounted to no more than "bravado and bluster" that was "likely to be discounted by other employees." *Manorcare of Kingston PA, LLC*, 360 NLRB No. 93 (Apr. 29, 2014). But as the Board acknowledged, the statements then were "apparently characterized out of context" when the initial recipients repeated them to other employees. *Id.* "In other words," the Board assumed, "these were characterizations by those who had not made the statements and, further, repeated to employees who" were left to draw their own conclusions about the extent of the statements' threatening nature without "the benefit of hearing them and evaluating them personally." *Id.*

In declining to overturn the election in those circumstances, the Board noted its historic "reluctan[ce] to set aside an election where employees circulate third-party statements that have been stripped of their original context." *Id.* The Board also cited a concern that setting aside the election "would open the door to objections being

substantiated by rumors devoid of any truth, and encourage false attributions in order to influence election outcomes." *Id.* Those general considerations, in my mind, could form the foundation of a decision declining to set aside the election in this case under the analysis established by *Westwood Horizons Hotel*.

The Board's recitation of those considerations, however, was not just the foundation of its decision—it was essentially the entirety of the Board's analysis. The Board, for instance, failed to note or contend with its prior decisions, including those cited by the majority, *see, e.g.*, *Q.B. Rebuilders, Inc.*, 312 NLRB 1141 (1993), that could be seen to be in some tension with its conclusion on the main issue before it here: whether joking or blustery comments, when further disseminated in a manner divorced from their original context, "create a general atmosphere of fear and reprisal rendering a free election impossible," *Westwood Horizons Hotel*, 270 NLRB at 803. Moreover, the Board, as noted, did not apply the *Westwood Horizons Hotel* factors to the facts of this case. The Board also made no effort in its analysis to address the closeness of the election (34 votes in favor of the Union and 32 votes against), which the Board's precedent suggests could be a significant consideration in deciding whether to rerun an election. *See Robert Orr-Sysco Food Servs., LLC*, 338 NLRB 614, 615 (2002).

In the end, although one can conceive of ways to align the Board's conclusion in this case with its prior decisions, "[i]t is not this court's role to supply post hoc justifications for the Board's result; the duty to justify lies exclusively with the Board in the first instance." *United Food & Commercial Workers v. NLRB*, 880 F.2d 1422, 1437 (D.C. Cir. 1989). And while there of course is no requirement for the Board to engage in an examination of any particular length, here, the

Board needed to do more to explain how its decision fit within its precedents, as indicated by the hearing officer's reaching the contrary conclusion under those precedents.

For those reasons, I would remand this case to the Board to give it an opportunity (if it elected to adhere to its original conclusion) to ground its decision in its prior cases and further explain its rationale for finding that a new election is unwarranted in the circumstances. *See Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1249 (D.C. Cir. 1994); *United Food & Commercial Workers*, 880 F.2d at 1439. I thus concur in the judgment of the court insofar as it grants the petition for review in part and denies the Board's cross-application for enforcement in part.