# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 15, 2016          Decided January 24, 2017

No. 15-1204

800 RIVER ROAD OPERATING COMPANY, LLC, D/B/A
WOODCREST HEALTH CARE CENTER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

1199 SEIU UNITED HEALTHCARE WORKERS EAST,
INTERVENOR

Consolidated with 15-1281

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Brian J. Gershengorn* argued the cause for Petitioner. With him on the briefs were *Harold P. Coxson* and *Seth D. Kaufman*.

*Marni von Wilpert*, Attorney, National Labor Relations Board, argued the cause for Respondent. With her on the

brief were *Kira Dellinger Vol*, Supervisory Attorney, *Richard Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, and *Linda Dreeben*, Deputy Associate General Counsel.

*Katherine H. Hansen* argued the cause for Intervenor in support of Respondent. With her on the brief was *William S. Massey*.

Before: ROGERS, BROWN, and MILLETT, *Circuit Judges*.

Opinion for the Court filed by BROWN, *Circuit Judge*.

BROWN, *Circuit Judge*:  On March 9, 2012, a unit of employees at 800 River Road Operating Company d/b/a Woodcrest Healthcare Center ("Woodcrest") elected 1199 SEIU United Healthcare Workers East Union ("the Union") as its exclusive collective-bargaining representative. Woodcrest filed objections to the election with the National Labor Relations Board ("the NLRB" or "the Board"). It now challenges certain conduct that occurred during the ensuing representation hearing.

Woodcrest asserts three reasons to conclude the Hearing Officer abused his discretion in the underlying proceeding, and it also argues the Board abused its discretion when it affirmed the Hearing Officer's recommendations to overrule Woodcrest's objections. It now asks this Court to set aside the Board's order requiring it to bargain with the Union, *see 800 River Road Operating Co.*, 362 N.L.R.B. No. 114 (2015), and to remand for a new election. The Board and the Union as Intervenor seek enforcement of the Board's order.

We deny Woodcrest's petition and grant the Board's cross-application for enforcement.

3

I.

Woodcrest argues the Hearing Officer abused his discretion in three respects. Because Woodcrest seeks to set aside the Board's affirmation of the Hearing Officer's recommendations, assessing these challenges requires detailed consideration of the underlying facts and procedural history.

A.

On January 23, 2012, the Union filed a petition to represent a unit of employees at Woodcrest, a skilled nursing facility in Milford, New Jersey. The election took place on March 9, 2012, resulting in a 122–81 vote in favor of representation. Two additional ballots were challenged.

Woodcrest filed twelve timely objections to the conduct of the election, *see* 29 C.F.R. § 102.69(a), alleging various forms of unlawful conduct had occurred prior to the election. *See* 29 U.S.C. § 158(a)(1) (making it unlawful "for an employer . . . to interfere with, restrain, or coerce employees" during a representation election). Pursuant to Board regulations, Woodcrest attached a "written offer of proof" to its objections that "identif[ied] each witness [it] would call to testify concerning the issue and summarizing each witness's testimony." 29 C.F.R. § 102.66(c); *id.* § 102.69(a). Only the Regional Director reviewed the content of this offer of proof. *See id.* § 102.69(a) ("The party filing the objections shall serve a copy of the objections, including the short statement of reasons therefor, *but not the written offer of proof*, on each of the other parties to the case . . . ." (emphasis added)); *id.* ("The regional director will transmit a copy of the objections to each of the other parties to the proceeding, *but shall not transmit the offer of proof*." (emphasis added)).

Based on this offer of proof, the Regional Director determined Objections One and Two should proceed to a hearing before an NLRB Hearing Officer; the remaining ten objections were dismissed. *See id.* § 102.69(c)(1)(ii) (noting the Regional Director will set objections for hearings if he "determines that the *evidence described in the accompanying offer of proof* could be grounds for setting aside the election if introduced at a hearing . . . ." (emphasis added)). Both of the surviving objections pertained to behavior of certain Woodcrest supervisors during the "critical period"—i.e., the period of time between the petition for representation and the election. Objection One alleged three Woodcrest supervisors (Janet Lewis, Bonita Thornton, and Jane Cordero) "created a coercive atmosphere and/or interfered with employee free choice by soliciting Union authorization cards and/or creating the impression that they had solicited or were soliciting [such] cards." Pet'r Br. 8. Objection Two claimed three Woodcrest supervisors (Israel Vergel de Dios, Cordero, and Thornton) "created a coercive atmosphere and/or interfered with employee free choice by promoting the Union and/or creating the impression that they favored the Union, conveying to voters that they should support the Union." Pet'r Br. 9. *See Harborside Healthcare, Inc.*, 343 N.L.R.B. 906, 909 (2004) (setting forth the NLRB's two-prong test for assessing coercive supervisory conduct during an election).

The hearing took place over the course of three days—Thursday May 10, Friday May 11, and Monday May 14. On the morning of the first day, Woodcrest called four witnesses. First, it solicited testimony from Loesha Chase, who had previously worked as a companion to two of Woodcrest's residents through a third-party company.[1] Woodcrest

---

[1] Chase stopped working for Woodcrest in 2004, but she still visited Woodcrest regularly in her capacity as a companion to its residents.

believed Chase "possessed knowledge of its supervisors' coercive and objectionable conduct and other information related to the union organizing campaign." Pet'r Br. 10. Instead, Chase said she had no knowledge of what occurred at Union meetings, no knowledge regarding the solicitation of Union cards, and no knowledge about which supervisors (if any) were involved in the organizing drive. Second, Woodcrest called Vergel de Dios, one of the supervisors it believed had committed objectionable conduct by "surreptitiously threatening employees with consequences if they did not support the Union or sign an authorization card." Pet'r Br. 10. He denied engaging in this conduct. Additionally, Vergel de Dios denied exerting influence over how his employees would testify if subpoenaed about his pre-election conduct. Instead, he explained he knew his staff would testify "truthfully"—i.e., that he never had "an influence with them to vote yes." J.A. 197–98. Throughout his testimony, Woodcrest also repeatedly sought permission to treat Vergel de Dios as a hostile witness, permission the Hearing Officer did not grant.

Third, Woodcrest called Lewis, another supervisor whom it believed had committed objectionable conduct by soliciting Union cards and influencing employees to join the Union. Lewis said she had not encouraged employees to research the Union and had no knowledge of objectionable conduct committed by Thornton. She also denied being approached by employees as a source of Union authorization cards and asked Woodcrest's attorney, "What's a [U]nion card?" J.A. 225.

Lastly, Woodcrest called Lorri Senk, the administrator responsible for operational and human resources functions. Senk testified Susan Langdon—an evening supervisor of Woodcrest's registered nurses—had told her about Jane

Cordero's involvement in organizing the Union. Langdon informed Senk that Langdon had overheard Cordero speaking to an unnamed licensed practical nurse about "getting employees to attend [a] [U]nion meeting." J.A. 229–30. Langdon believed Cordero withheld information about Union representatives making home visits and phone calls to Woodcrest employees. Additionally, Senk testified Maria Sanchez, a Woodcrest employee, "had stated on several occasions" that various supervisors—including Cordero and Lewis—were involved in the Union organizing campaign. J.A. 239. Finally, Senk stated she found a list of "[U]nion insiders" slipped under her door that included Dave Repoli— Woodcrest's former administrator, Clarice Gogia— Woodcrest's former Director of Nursing, and Jane Cordero. J.A. 234.

On the morning of the hearing's second day, Woodcrest presented three additional witnesses. First, it called Cordero—the supervisor about whom Senk had testified. Cordero denied participating in any untoward Union authorization card distributions. She also denied engaging in any conversations about getting employees to attend Union meetings, which contradicted Senk's testimony. Second, Woodcrest called Clarice Gogia—one of the employees included on the list of "Union insiders" Senk said she had received. Gogia testified her last day of employment at Woodcrest was June 15, 2011—six months before the Union filed its petition for representation.[2] She denied having any knowledge of any supervisors engaging in objectionable conduct. Finally, Woodcrest called Katherine Frost, Woodcrest's former Director of Admissions and Marketing. Frost ceased working at Woodcrest in July 2011—

---

[2] In his report, the Hearing Officer stated Gogia ceased employment in June, 2012.

approximately six months before the filing of the representation petition—and testified she entered Woodcrest only once per month during the three-month critical period. Nevertheless, Woodcrest believed she was "actively involved in assisting the Union's organizing efforts." Pet'r Br. 10. Like the others, she denied giving such assistance, instead testifying she made no observations about a Union drive during her visits, and she "wouldn't know any [U]nion contacts." J.A. 291; *see also* J.A. 293 (noting she learned of the election only after it occurred). She also stated she knew of no objectionable supervisory conduct.

At this point, a midday recess was taken. During the recess, the parties discussed three separate groups of witnesses, each of which is crucial to this case.

First, Woodcrest met *ex parte* to request the Hearing Officer issue subpoenas to six of Vergel de Dios's approximately twenty-four subordinates regarding his pre-election conduct. *See* 29 C.F.R. § 102.66(f) (permitting *ex parte* requests). NLRB regulations mandate issuance of such subpoenas, *id.*, but, instead, the Hearing Officer invited the Union's attorney to participate in both an off-the-record and an on-the-record conversation about the potential witnesses.

Woodcrest explained its need for the subpoenas based on the allegedly conflicting testimony of Vergel de Dios and Senk. Whereas Vergel de Dios had testified he did not tell his subordinates what to say if asked about his pre-election conduct, Senk testified Vergel de Dios had stated at a meeting of department heads "he didn't have anything to worry about because he had spoken with his people and he knew what they would say, and they would have his back." J.A. 301. Woodcrest interpreted Senk's testimony as demonstrating

Vergel de Dios had sought to influence any future testimony given by his employees.

Woodcrest had not previously interviewed any of the six witnesses because they had all exercised their *Johnnie's Poultry* rights not to speak to Woodcrest before the hearing. *See* 146 N.L.R.B. 770, 775 (1964) (holding that, when interrogating an employee before a hearing, an employer "must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis . . . "). Nevertheless, Woodcrest argued it had a "reasonable belief" the six employees would have "factually based firsthand knowledge" of Vergel de Dios's pre-election conduct because they were "members of his department." J.A. 304. Their testimony would help Woodcrest establish Vergel de Dios's lack of candor regarding whether he attempted to exert influence over his subordinates' potential testimony. Further, Woodcrest stated that, based on Vergel de Dios's purportedly dishonest testimony, "[a] conclusion could be drawn about how that group of employees even voted." J.A. 301.

Next, the parties discussed subpoenas that had already been issued to eight Woodcrest employees. Woodcrest contended these individuals "were actively engaged in the [Union] campaign [and were] the most likely people to know whether the supervisors engaged in pro-union conduct." J.A. 309. All eight employees also had exercised their *Johnnie's Poultry* rights, meaning Woodcrest could not attest to the content of their testimony. Despite this fact, Woodcrest represented it would ask "specific, direct questions as to what knowledge they have, if any, as to were supervisors engaging in pro-union conduct [sic]." J.A. 308. Throughout the discussion, the Hearing Officer seemed to presume the

witnesses definitively had no firsthand knowledge, as exemplified by the following exchanges:

> HEARING OFFICER: Okay. My inclination is that there is nothing that [the subpoenaed witness] is going to tell us that is going to— there's no direct knowledge of, there's no facts that she has that—
>
> MR. MENDELSON: Well, how would any of us know it. She hasn't been vetted.
>
> HEARING OFFICER POMIANOWSKI: Right. . . .

J.A. 309. And again:

> HEARING OFFICER: What I'm saying is . . . [the witness] does not have any factually based, direct knowledge about the objections, themselves.
>
> MR. MENDELSON: I can't agree with that statement.

J.A. 320.

Lastly, the parties discussed five witnesses with whom Woodcrest *had* previously spoken. Consequently, Woodcrest *could* affirmatively assert these individuals possessed knowledge of, among other things, supervisory solicitation of Union cards and support of the Union.

After the recess concluded, Woodcrest put three more witnesses on the stand. First, Cartney Ezyk testified. During the recess, Woodcrest represented to the Hearing Officer that

Ezyk would testify he was told employees who wanted Union authorization cards should speak to Lewis, and Ezyk's testimony backed up this representation. Second, Woodcrest called Remi Sajimi, a licensed practical nurse at Woodcrest. Sajimi had also exercised *Johnnie's Poultry* rights, but, during the recess, Woodcrest represented to the Hearing Officer Sajimi would testify "Jane Cordero told her . . . that [she] would make sure certain employees made it to a [U]nion meeting." J.A. 308. On the stand, Sajimi denied this. Finally, Woodcrest called Thornton—the last of the supervisors whom it believed had engaged in objectionable conduct. She, like the others, denied any wrongdoing.[3]

At the conclusion of the afternoon testimony, the Hearing Officer denied the requests for the six subpoenas of Vergel de Dios's subordinates. He explained the subpoenas were "exploratory" and emphasized Woodcrest's inability to make an offer of proof that the witnesses had "specific knowledge, firsthand knowledge, factually based on the objections." J.A. 344–45. For the same reasons, he also explained he would not permit the eight, already-subpoenaed witnesses to testify. However, he stated the five "vetted" witnesses with direct knowledge could testify on Monday.

When Monday morning arrived, however, Woodcrest refused to continue participating in the Hearing. After informing the Hearing Officer his Friday-afternoon rulings had "irrevocably and hopelessly compromised [its] ability to make [its case]," J.A. 363, it voluntarily left the proceedings.

---

[3] Woodcrest had planned on calling a fourth witness—Ms. Beziole—but the Hearing Officer would not hear her testimony.

B.

On June 4, 2012, the Hearing Officer recommended overruling both of Woodcrest's election objections. The report faulted Woodcrest for not presenting witnesses with "first-hand factual knowledge" of the objections, despite its "prior representation to the Regional Director." J.A. 23. It also noted Woodcrest's refusal to continue participating in the Hearing. The Hearing Officer concluded Woodcrest was "using the hearing to investigate" conduct rather than present a case. J.A. 24. The report did not mention either the denial of the six requested subpoenas or the refusal to hear the testimony from the eight subpoenaed witnesses.

On January 9, 2013, the Board affirmed the Hearing Officer's report, concluding that, under the circumstances, "the hearing officer acted reasonably to halt the employer's manifest fishing expedition." J.A. 70. Though the Board acknowledged the Hearing Officer committed error by not issuing the six subpoenas, the error was not prejudicial. *See* J.A. 70 (noting "it is reasonable to conclude that even had the hearing officer issued the requested subpoenas, he would have refused to permit the witnesses to testify or, if presented with a petition, would have revoked those subpoenas"). The Board certified the Union as the exclusive collective-bargaining representative for the relevant Woodcrest employees on November 26, 2014.[4]

The National Labor Relations Act ("the Act") does not permit this Court to directly review the Board's certification decision. *See* 29 U.S.C. § 159(d); *see also Boire v.*

---

[4] The Board issued its first certification decision on July 10, 2013, *see 800 River Road Operating Co.*, 359 N.L.R.B. No. 129 (2013), but that order was set aside after the Supreme Court's decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014).

*Greyhound Corp.*, 376 U.S. 473, 476–80 (1964). To obtain review, an employer must refuse, as Woodcrest did here, to bargain with the Union. Consequently, on February 7, 2013, the Union filed unfair labor practice claims under 29 U.S.C. § 158(a)(1) and (5). The NLRB's General Counsel ("GC") issued a complaint against Woodcrest on February 19, 2013, and the Board granted summary judgment in favor of the GC on June 15, 2015. *See 800 River Road Operating Co.*, 362 N.L.R.B. No. 114 (2015). The unfair labor practice order gives this Court jurisdiction under 29 U.S.C. § 160(e) and (f).

Woodcrest now asks this Court to set aside the Board's June 15 order and to remand with instructions for a new election rather than a new hearing. It alleges the Hearing Officer abused his discretion and caused prejudicial error when he failed to (1) issue the requested subpoenas for six of Vergel de Dios's employees; (2) permit eight subpoenaed witnesses to testify at the Hearing; and (3) grant Woodcrest's request to treat Vergel de Dios as a hostile witness. Woodcrest also contends the Board abused its discretion when it "inexplicably affirmed [the Hearing Officer] with little analysis" and overruled Woodcrest's objections. Pet'r Br. 21, 30. The Board seeks enforcement of its June 15 order, which compels Woodcrest to provide the Union with certain requested information, as well as to bargain with the Union. The Union intervened in support of the Board.

## II.

### A.

This Court has noted that, "[o]n questions regarding representation, we accord the Board an especially wide degree of discretion." *Randell Warehouse of Ariz., Inc. v. NLRB*, 252 F.3d 445, 447–48 (D.C. Cir. 2001). We "will overturn a Board decision to certify an election in only the rarest of

circumstances." *N. of Market Senior Servs., Inc. v. NLRB*, 204 F.3d 1163, 1167 (D.C. Cir. 2000); *see also id.* ("A party seeking to overturn an election bears a *heavy burden* of showing that the election is invalid." (emphasis added)); *Randell Warehouse*, 252 F.3d at 448 ("[T]he scope of our review of the Board's decisions in cases involving certification is extremely limited.").

Notwithstanding this extraordinary deference, the Board's discretion "has limits." *Int'l Transp. Serv. Inc. v. NLRB*, 449 F.3d 160, 163 (D.C. Cir. 2006). The Court is "not merely the Board's enforcement arm," *Randell Warehouse*, 252 F.3d at 448, and will not simply "rubberstamp" Board decisions. *Int'l Transp. Serv.*, 449 F.3d at 163. Instead, we have the "responsibility to examine carefully both the Board's findings and its reasoning . . . ." *Randell Warehouse*, 252 F.3d at 448. Additionally, this Court sets aside Board orders that have "no reasonable basis in law, either because the proper legal standard was not applied or because the Board applied the correct standard but failed to give the plain language of the standard its ordinary meaning." *NLRB v. McClatchy Newspapers, Inc.*, 964 F.2d 1153, 1156 (D.C. Cir. 1992).

B.

We will "affirm the Board's order to bargain unless the Board abused its discretion in overruling [an employer's] objections," *Randell Warehouse*, 252 F.3d at 448, and the abuse of discretion was prejudicial, *see Ozark Auto. Distribs., Inc. v. NLRB*, 779 F.3d 576, 582 (D.C. Cir. 2015) (noting the harmless-error rule exists "[i]n administrative law, as in federal civil and criminal litigation"). An error is harmless unless it "affected the outcome of the [underlying] proceedings." *United States v. Coumaris*, 399 F.3d 343, 347

(D.C. Cir. 2005); *see also Salem Hosp. Corp. v. NLRB*, 808 F.3d 59, 68 (D.C. Cir. 2015) (noting no prejudice occurs where "excluded evidence would not compel or persuade to a contrary result"). Whether an error is prejudicial "depends on a number of factors, including the closeness of the case, the centrality of the issue in question, and the effectiveness of any steps taken to mitigate the effects of the error." *Huthnance v. District of Columbia*, 722 F.3d 371, 381 (D.C. Cir. 2013).

## III.

Woodcrest faults the Hearing Officer for failing to provide a full and fair hearing of its objections.

## A.

First, Woodcrest claims the denial of its request to subpoena six of Vergel de Dios's subordinates destroyed a "central" aspect of its case because the employees "would have" provided testimony concerning Vergel de Dios's "objectionable and coercive conduct." Pet'r Br. 23. Since NLRB regulations mandate the issuance of such subpoenas, 29 C.F.R. § 102.66(f), the denial undisputedly constituted error—a fact the NLRB recognized when it adopted the Hearing Officer's recommendations. Thus, to prevail, Woodcrest need only demonstrate the error was not harmless. *See Salem Hosp.*, 808 F.3d at 68 (noting no prejudice occurs where "excluded evidence would not compel or persuade to a contrary result").

Unfortunately for Woodcrest, it cannot make this showing here. The company's failure to meet this burden has less to do with the Hearing Officer's rulings than its lawyer's litigation choices.

Most notably, Woodcrest walked out of the hearing on Monday morning. This voluntary choice means we cannot separate the harm Woodcrest suffered (if any) as a result of the Hearing Officer's denial from the prejudice caused by Woodcrest's decision to truncate the hearing. For instance, according to Woodcrest, the subpoena denials prevented six of Vergel de Dios's employees from providing testimony establishing Vergel de Dios's improper influence over his subordinates. Yet, Woodcrest's choice not to present its five remaining witnesses also prevented the Hearing Officer from hearing from an employee who allegedly would have testified Vergel de Dios told him to "vote what your heart tells you, as well as vote what is best for you." J.A. 316–17. If this witness testified consistently, he would have directly undercut Vergel de Dios's denial. *See* J.A. 206–07. Perhaps Woodcrest was prejudiced by the Hearing Officer's decision to deny the subpoenas. *See Ozark*, 779 F.3d at 585 (noting the Court's willingness to "assum[e] that the documents, if disclosed, would have supported the company's claim" when assessing the prejudicial effect of a hearing officer's decision to quash subpoenas). But perhaps Woodcrest's own decision to short-circuit the hearing and forgo the evidence it might have provided had a greater impact. Woodcrest cannot simply create (or contribute to the creation of) prejudice and then plead reversible error. It must demonstrate the NLRB's error was dispositive. *See Salem Hosp.*, 808 F.3d at 68.

Additionally, Woodcrest has not actually shown the denials "excluded critical evidence." Pet'r Br. 21. In its brief, Woodcrest claims the six employees were "central" to its case because they "*would have testified* as to Vergel de Dios' objectionable and coercive conduct." Pet'r Br. 23 (emphasis added). Woodcrest also argues the centrality of the testimony would have prevented the Hearing Officer from revoking the subpoenas once given. *See* 29 C.F.R.

§ 102.66(f) (permitting revocations "if, in [the hearing officer's] opinion, the evidence whose production is required does not relate to any matter under investigation or in question in the proceedings"). But Woodcrest does not back up these claims with any concrete evidence. When arguing before the Hearing Officer and this Court, all Woodcrest offered to support its "reasonable belief" that these witnesses had relevant knowledge was the fact that they were "members of [Vergel de Dios's] department." *See, e.g.*, J.A. 304; Oral Arg. Tr. 10–11. It could not specify why these six, as compared to the other approximately eighteen employees supervised by Vergel de Dios, had relevant knowledge. Oral Arg. Tr. 42–43. And, when pressed at oral argument to justify the need for the testimony, Woodcrest's counsel admitted it did not "know[] at the end of the day" what they would say. Oral Arg. Tr. 10.

By contrast, it appears Woodcrest voluntarily chose *not* to call witnesses whom it had expressly identified as having knowledge about Vergel de Dios's behavior. When Woodcrest first filed its objections, it submitted to the Regional Director a list of witnesses it planned to call, along with a description of what they would say in their testimony. *See* 29 C.F.R. § 102.69(a). According to Board case law, this offer of proof needed to "specifically identify[] witnesses who would provide direct rather than hearsay testimony to support its objections, specifying which witnesses would address which objections." *Transcare N.Y., Inc.*, 355 N.L.R.B. 326, 326 (2010); *see also City Wide Insulation of Madison, Inc.*, 338 N.L.R.B. 793, 795 (2003) (noting the objecting party must send this evidence to the Regional Office). This offer of proof served as the basis for the Regional Director's decision to set the two objections for a hearing. *See* 29 C.F.R. § 102.69(c)(1)(ii) (noting the Regional Director will set objections for hearings if he "determines that the *evidence*

*described in the accompanying offer of proof* could be grounds for setting aside the election if introduced at a hearing . . . ." (emphasis added)).  In his report recommending Woodcrest's first two objections proceed to a hearing, the Regional Director explicitly stated Woodcrest's offer of proof "provided the names of several supervisory *and bargaining unit employees* whom it contends will testify that Environmental Director Israel Vergel de Dios . . . actively supported the Union."  J.A. 6.  In support, Woodcrest "assert[ed] that the witnesses will testify that Vergel de Dios expressed his opinion to unit employees that they were underpaid and unappreciated and, thus, needed the protection of the Union."  *Ibid.*  Yet, at oral argument, Woodcrest's counsel stated neither the six subpoenaed employees nor the five employees it refused to call on Monday were on the list submitted to the Regional Director.  Oral Arg. Recording 49:20; Oral Arg. Tr. 49.  Assuming Woodcrest provided truthful submissions to the Regional Director, it cannot now demonstrate to this Court that the Hearing Officer's refusal to issue the subpoenas served as the source of prejudice, as compared to Woodcrest's own decision not to call the employees it asserted had already provided it with direct knowledge of Vergel de Dios's coercive conduct.

All told, Woodcrest's voluntary decision to leave the Hearing, its failure to demonstrate the centrality of the witnesses to its case, and the potential for the Hearing Officer to exercise permissible discretion to revoke the subpoenas means Woodcrest cannot prove the denial of the six subpoenas "irreparably prejudiced" its case.  Pet'r Br. 38.  It thus has not demonstrated reversible error occurred.

In addition to its prejudice arguments, Woodcrest points to our decision in *ManorCare, LLC v. NLRB*, 823 F.3d 81, 87 (D.C. Cir. 2016), and urges us to find, as we did there, that the

Board abused its discretion because its analysis was too "cursor[y]" or "truncated." But that decision has no bearing on the instant case. In *ManorCare*, the employer presented direct testimony from multiple employees that two other employees had threatened to "punch[] people in the face," "beat[] people up," and "slash [people's] tires," among other things. *Id.* at 83–84. This testimony was also corroborated by "several other managers and supervisors." *Id.* at 84. The Hearing Officer found these threats disturbed the laboratory conditions necessary for a fair and free election, *id.*, but the Board reversed, finding the threatening statements were jocular in nature, *id.* at 85. In doing so, the Board disregarded its own precedent, which laid out six factors for assessing a threat's seriousness and its likelihood of causing voter intimidation. *Id.* at 85–87. Instead, "the Board cursorily acknowledged its own precedent and then dismissed the effect of the threatening statements." *Id.* at 87. Within *that* context, we found the Board's discussion "too brief to demonstrate how the facts of [that] case align[ed] with the Board's precedent." *Id.*

Here, by contrast, we contextualize the Board's discussion within a hearing where ten witnesses provided virtually no testimony of objectionable conduct, a fact which the Hearing Officer discussed at length in his report. *See* J.A. 25–30 (summarizing each of the ten witness's testimony and highlighting how each failed to corroborate Woodcrest's representations); *see also* J.A. 70 (Board adoption of Hearing Officer's recommendations) (referencing this same lack of corroboration to support its conclusion that Woodcrest was not prejudiced by the denial of the subpoenas). Further, we place it within a hearing where the employer chose to voluntarily walk out rather than proffer any additional evidence to strengthen its case—another fact acknowledged by the Hearing Officer. *See* J.A. 23. Within this framework,

we cannot find the NLRB abused its discretion when it affirmed the Hearing Officer's recommendations, concluded Woodcrest was engaging in a "fishing expedition," J.A. 70, and dismissed the error as harmless. *See Huthnance*, 722 F.3d at 381 (noting courts consider "the closeness of the case" when assessing the prejudicial effect of an error).

B.

Woodcrest next contends the Hearing Officer abused his discretion when he refused to permit eight, already-subpoenaed witnesses to testify. Woodcrest argues the Hearing Officer imposed a "novel requirement" by insisting Woodcrest confine its case only to witnesses it had previously "vetted." Pet'r Br. 47. According to Woodcrest, this imposition is especially inappropriate in the context of such investigation hearings, which provide no pre-hearing discovery mechanisms and which afford subpoenaed witnesses the right not to speak to the employer beforehand. *Johnnie's Poultry Co.*, 146 N.L.R.B. at 775. Since all eight witnesses had exercised these rights, Woodcrest asserts the "vetting" requirement placed it in an impossible position.[5]

As a general matter, Woodcrest identifies a valid potential concern. The Hearing Officer did repeatedly inform Woodcrest he wanted to hear from witnesses with "firsthand" or "direct" knowledge. *See, e.g.*, J.A. 304, 309, 320. Under NLRB regulations, the employer has the burden of demonstrating objectionable conduct. *Harborside Healthcare*, 343 N.L.R.B. at 910 (noting the objecting party

---

[5] Just how impossible is difficult to assess. Woodcrest represented to the Board that it interviewed "between 100 and 150 employees" over four days. J.A. 76. But the record does not reveal how many of these employees spoke at length to Woodcrest, as opposed to summarily exercising their *Johnnie's Poultry* rights.

has the burden "to establish, not just that objectionable acts occurred, but also that they interfered with the employees' exercise of free choice to such an extent that they materially affected the results of the election"); *Amalgamated Clothing Workers of Am. v. NLRB*, 424 F.2d 818, 827 (D.C. Cir. 1970) (noting a party "must produce specific evidence" of inappropriate conduct). And, it must meet this burden, notwithstanding the lack of discovery mechanisms, the existence of *Johnnie's Poultry* rights, and the bar against using a representation hearing as a "fishing expedition." *Cauthorne Trucking*, 256 N.L.R.B. 720, 720 (1981). Furthermore, particularly in cases like the instant one—where the supervisors cause the allegedly objectionable conduct— the employer may find it difficult to find either a supervisor eager to confess or an employee willing to implicate a supervisor. In that case, limiting witnesses solely to those with "direct knowledge" may constitute an abuse of discretion that hamstrings the employer, leaving no feasible means for it to meet the evidentiary burden.

But that is not the case here. After two days of testimony, and in the absence of any proffer outlining the anticipated testimony's relevance, the Hearing Officer did not abuse his discretion by refusing to hear eight additional witnesses.

Given the specific and direct testimony prefigured by Woodcrest's submissions to the Regional Director, the initial focus on general witnesses is puzzling. Despite its offer of proof, nine out of Woodcrest's ten witnesses provided no direct testimony of objectionable conduct and, in fact, provided testimony that directly contradicted Woodcrest's

representations.[6] Though the Hearing Officer never saw the offer of proof, he knew of its existence and what it must contain. *See* J.A. 23 (noting, in his report, Woodcrest did not provide "any testimony of first-hand factual knowledge of facts surrounding the alleged objectionable conduct[,] . . . notwithstanding counsel's prior representation to the Regional Director that it would present direct factual testimony from witnesses to demonstrate that Petitioner engaged in the alleged objectionable conduct"). After two days, it was reasonable for the Hearing Officer to conclude he needed a more substantial proffer to justify allowing the parade of witnesses to continue.

Furthermore, though the Hearing Officer used words like "direct" and "firsthand," J.A. 309, 320, the record read as a whole reveals the Hearing Officer's willingness to allow witnesses to testify, so long as Woodcrest could provide any basis—even circumstantial evidence—for that testimony. Or, to put it another way, we read the Hearing Officer not as asking Woodcrest to tell him *what* the witnesses would say, but to tell him *how* it knew what the witnesses *likely* would say.

The Hearing Officer's differing treatment of two of Woodcrest's potential witnesses—Remi Sajimi and Ms. Beziole—illustrates this point. Sajimi had exercised her *Johnnie's Poultry* rights, and Woodcrest accordingly could not vet her. Woodcrest represented to the Hearing Officer that an employee with "direct knowledge" had told Woodcrest she had "overheard . . . Cordero telling Remi that [Cordero] would make sure certain employees attended a [U]nion meeting." J.A. 307. Despite this extremely attenuated,

---

[6] The tenth witness provided hearsay testimony about Langdon—a Woodcrest supervisor—and Sanchez—a Woodcrest employee; Woodcrest did not follow up by calling either party to testify.

hearsay evidence, the Hearing Officer stated Sajimi had "direct knowledge," J.A. 308, and she was permitted to testify. In contrast, the Hearing Officer did not permit the testimony of Ms. Beziole. Unlike Sajimi, Woodcrest believed Ms. Beziole had relevant knowledge only because she was a "[U]nion supporter." J.A. 309. Woodcrest used this same "Union supporter" assertion to justify its need for the eight subpoenas. The Hearing Officer refused to hear from all nine witnesses on the same grounds: Woodcrest could not make any proffer to back up its representations about what the employees would say once called. The decision to deny the eight subpoenas also came *after* Remi Sajimi testified, where she contradicted Woodcrest's representation and instead corroborated Cordero's version of events.

Under these circumstances, we cannot say the Hearing Officer abused his discretion by requiring Woodcrest to provide even the most basic proffer in support of its request for additional witnesses after two full days of testimony. Moreover, even had we found the Hearing Officer abused his discretion, Woodcrest's voluntary decision to walk out of the hearing again prevents it from demonstrating reversible error. *See supra* Part III.A. Thus, under either the abuse-of-discretion or reversible-error prongs of the analysis, Woodcrest's argument fails.

C.

Finally, we easily dismiss Woodcrest's contention that the Hearing Officer abused his discretion by refusing to allow Woodcrest to treat Vergel de Dios as a hostile witness. NLRB regulations expressly state "rules of evidence prevailing in courts . . . shall not be controlling" in proceedings challenging election results. 29 C.F.R. § 102.66(a). Consequently, we cannot say the Hearing

Officer abused his discretion by opting not to apply a nonbinding rule, especially since the Hearing Officer did permit Woodcrest to ask leading questions and to continue lines of questioning to which the Union objected. *See, e.g.*, J.A. 184–85 (allowing leading questions); J.A. 185 (overruling objection because the Hearing Officer "want[ed] to see where this is going"); J.A. 196 (overruling relevance objection because he "still want[ed] to hear it"); J.A. 206–07 (noting he "wanted to hear the answer" to the leading question "did you . . . ever have the discussion about words to the effect of voting what your heart tells you" or "vote what is best for you"); J.A. 208–09. As a result, we also cannot say the Board abused its discretion when it affirmed the Hearing Officer's recommendations, particularly given the "especially wide degree of discretion" this Court affords the Board "[o]n questions regarding representation." *Randell Warehouse*, 252 F.3d at 447–48.

## IV.

Because we hold the Board did not abuse its discretion, we deny Woodcrest's request to set aside the Board's June 15 order and to remand with direction for a new election. We grant the NLRB's cross-application for enforcement of the same order.

*So ordered.*